[No. 25506–1–I.   Division One.   May 6, 1991.]

THE LAKES AT MERCER ISLAND HOMEOWNERS ASSOCIATION,
*Appellant,* v. BONNIE WITRAK,
ET AL, *Respondents.*

*H. Michael Fields,* for appellant.

*Stephen O. Kenyon,* for respondents.

FORREST, J.—The Lakes at Mercer Island Homeowners Association (Homeowners) appeals the trial court's grant of summary judgment, arguing that issues of fact were presented relating to Bonnie Witrak's compliance with provisions of the Homeowners Declaration of Covenants, Conditions and Restrictions (CCR). We reverse.

Bonnie Witrak and Tom Gumprecht live in a residential subdivision located on Mercer Island, known as "The Lakes at Mercer Island" (The Lakes). In spring of 1987, John and Maryann Deming began construction on the lot adjacent to Witrak. In May 1987, Witrak planted 55 pyramidalis trees on her property to screen her property from the Demings. She did not seek the approval of the Homeowners Architectural Control Committee (ACC), nor was it required. She then built a 6–foot fence on the lot line between the two properties. Prior to construction, Witrak had sought and obtained ACC approval to build the fence pursuant to article 2, section 8 of the CCR.

In January 1988, Witrak hired an architect to design an addition to her home. In July 1988, she submitted the architect's plans to the ACC. It denied approval of the addition by letter dated August 15, 1988. Witrak requested that the ACC reconsider. It refused. A meeting between Witrak, the ACC and the Homeowners board of directors on September 19, 1988, did not change the ACC's decision.

On September 23, 1988, workers began excavation on Witrak's property. By September 25, 1988, they had planted a row of 12 Douglas fir trees, each between 25 and 30 feet in height immediately adjacent to the Witrak/Deming boundary line. On September 26, Witrak renewed her request for approval of the proposed addition. The

ACC again refused to allow the remodel; it also claimed the trees were planted in violation of the CCR and referred the matter to the Board. Witrak refused to remove the trees. The Board filed suit on October 18, 1988, seeking an order that the trees be removed. Both parties moved for summary judgment. On December 22, 1989, the trial court held that there were no material facts in dispute and concluded, as a matter of law, that the language of the CCR did not prohibit the trees. The Homeowners motion for reconsideration was denied. This appeal followed.

After reading the relevant provisions of the CCR the trial court concluded as a matter of law that the trees did not constitute a wall or fence. The material portion of article 2, section 8 of the CCR states:

> *Landscaping and Fencing. . . .*
> Fences, walls or shrubs are permitted to delineate the lot lines of each lot, subject to Architectural Control Committee approval, . . . .. In any event, no fence erected within the subdivision shall be over six feet (6') in height. No barbed wire, chain link or corrugated fiberglass fences shall be erected on any lot. All fences, open and solid, are to meet the standards set by the Architectural Control Committee and must be approved by the Committee prior to construction.

While restrictive covenants were once disfavored by the courts, upholding the common law right of free use of privately owned land, modern courts have recognized the necessity of enforcing such restrictions to protect the public and private property owners from the increased pressures of urbanization.[1] The primary objective in interpreting restrictive covenants is to determine the intent of the parties to the agreement.[2]

---

[1]*Thayer v. Thompson,* 36 Wn. App. 794, 796–97, 677 P.2d 787, *review denied,* 101 Wn.2d 1016 (1984).

[2]*Burton v. Douglas Cy.,* 65 Wn.2d 619, 621–22, 399 P.2d 68 (1965); *Hagemann v. Worth,* 56 Wn. App. 85, 782 P.2d 1072 (1989); *Thayer v. Thompson,* 36 Wn. App. at 796; *Fairwood Greens Homeowners Ass'n, Inc. v. Young,* 26 Wn. App. 758, 614 P.2d 219 (1980); *Foster v. Nehls,* 15 Wn. App. 749, 551 P.2d 768 (1976), *review denied,* 88 Wn.2d 1001 (1977).

We agree with the reasoning expressed by the Missouri Court of Appeals in *Thomas v. Depaoli*[3] that the clear intent of a restrictive covenant is determined by the purposes sought to be accomplished by the covenant. The *Thomas* court determined that a fence which obstructed the view of neighbors was a "building" as contemplated in a setback restriction.[4] This reasoning is consistent with prior Washington law. In *Foster v. Nehls*[5] the court declined to specifically define "one and one-half stories in height", opting instead to determine the purpose of the restriction and enjoin the building of a structure that obstructed a neighbor's view.

■■ Witrak suggests the courts must adopt literal definitions for the words of a covenant, claiming restrictive covenants should be "strictly" construed. While it is true that the courts should not give a covenant a broader than intended application, it is well settled that a covenant should not be read in such a way that defeats the plain and obvious meaning of the restriction.[6] Witrak also contends that any doubts regarding the interpretation of the covenants should be resolved in her favor.[7] While such a rule may have some validity when the conflict is between a homeowner and the maker of the covenants, it has limited value when the conflict is between homeowners.[8] In such a

---

[3]778 S.W.2d 745, 748 (Mo. Ct. App. 1989).

[4]The *Thomas* court cited the following: "The marked tendency of the courts is to give effect to the intention of the parties, and, in so doing, to extend the meaning of the term to cover structures that ordinarily would not fall within the strict definition of the word." *Thomas,* at 748, quoting 26 C.J.S. *Deeds* § 164(1), p. 1108 (1956).

[5]15 Wn. App. 749, 750, 551 P.2d 768 (1976).

[6]*Fairwood Greens,* at 762.

[7]*See Fairwood Greens,* at 761–62.

[8]The Homeowners Association in this case is made up of other homeowners and clearly reflects objections by Witrak's neighbors.

case the court should place special emphasis on arriving at an interpretation that protects the homeowners' collective interests.

The trial court appears to apply a "plain meaning" interpretation of the covenants. However, this decision was made prior to the Supreme Court holding in *Berg v. Hudesman*[9] rejecting such analysis in favor of the "context rule". In *Berg* the Supreme Court recognized that even the most ordinary words are only understood in the context of the surrounding document, the subject matter and objective of the contract, the surrounding circumstances, the subsequent acts and conduct of the parties, and the reasonableness of the respective interpretations of the contract.[10] The wooden fence previously built by Witrak was approved because it did not block the Demings' light or view. Witrak's proposed remodel was denied because it would adversely affect the neighbors' "outlook". It is only after such considerations that the language can be interpreted to arrive at the intent of the parties. Of particular interest to this case is the *Berg* court's emphasis on rejecting interpretations that are unreasonable and imprudent and accepting those which make the contract reasonable and just.[11]

The overall purpose of the CCR seems clear: protect the aesthetic harmony of the community, preserve an open natural appearance, and maintain the view and light of each property owner. Adopting a definition of "fence" as excluding trees and being limited only to a structure frustrates the purpose of the covenants. Article 2, section 8 specifically cites height, placement and appearance as primary factors to ACC approval of fences. In view of the

---

[9]115 Wn.2d 657, 801 P.2d 222 (1990).

[10]*Berg,* 115 Wn.2d at 666–67. This reasoning is consistent with rules of statutory interpretation that words which are capable of various meanings are best understood in a given case from the context in which it is used. *See Moran v. Washington Fruit & Produce,* 60 Wn. App. 548, 555, 804 P.2d 1287 (1990).

[11]*Berg,* at 672.

overall purposes and the specific control of "fences, walls and shrubs" delineating a boundary, it is almost inconceivable that the developer had any actual intent to allow a row of trees immediately adjacent to a property line without any control. If such is the meaning, it surely was not deliberate.

Contrary to Witrak's contention, even the literal meaning of "fences" does not exclude a row of trees along a property line. A common and ordinary meaning of "fence" is "a barrier", *Webster's Third New International Dictionary* 837 (1969), or "[a] hedge, structure, or partition, erected for the purpose of inclosing a piece of land, or to divide a piece of land . . . or to separate two contiguous estates." Black's Law Dictionary 745 (4th ed. 1968). These definitions preclude a summary judgment that trees may under no circumstances constitute a fence.

Witrak urges the court to reject as a matter of law the notion that fences may be naturally grown because it is not expressly provided for in the covenant. We are not persuaded. Normally, a property owner can plant a row of trees or other foliage to create a barrier between two contiguous pieces of property. Such "fencing" occurs on a regular basis. Prior courts have recognized that planting large bushy trees close together along a property line is indeed a "fence."[12] Shrubs performing the role of a fence in delineating property lines are expressly subject to ACC control. The difference between a "shrub" and a "tree" seems to be primarily botanical rather than functional.[13] What is the

---

[12]*Clyde Hill v. Roisen*, 111 Wn.2d 912, 767 P.2d 1375 (1989) (While the court was discussing a city fence ordinance that specifically defined "naturally grown fences", the court recognized that absent the legal definition, the trees were "factually" a fence. This discussion clearly indicates that it is not a strained interpretation of the covenant to include naturally grown barriers as a "fence".).

[13]*Webster's New World Dictionary* 1351 (college ed. 1968) defines "shrub" as "a bushy, woody plant with several permanent stems instead of a single trunk", while a "tree" is "a woody perennial plant with one main stem or trunk which develops many branches . . . 2. a treelike bush or shrub . . .". *Webster's*, at 1552.

difference for these purposes between a line of 15–foot cedar trees and line of 15–foot laurel shrubs? Given the covenant's clear concern with height and obstruction of neighbors' light and view, it would be a strange reading indeed that would require prior approval of relatively low shrubbery delineating a lot line but allow a property owner to plant large trees along the same lot line without ACC approval. Clearly the language cannot be interpreted as a matter of law to require such a result.

Witrak contends that since trees are expressly referred to in other sections of the CCR limiting their placement they may not be considered a fence. This argument is unpersuasive. The sections specifically dealing with trees address other concerns and do not limit the interpretation that should be given to article 2, section 8. Also unpersuasive is Witrak's argument that the trees do not delineate the lot line. The fact that the trees are slightly inside the legal boundary and there is a wooden fence *on* the boundary is immaterial. The trees are planted in such a manner that visually they mark the property line which makes it impossible to say as a matter of law that they do not delineate the lot line.[14]

The Homeowners also argue that the trees should be considered part of Witrak's remodel plans and require prior ACC approval pursuant to article 7, section 5.[15] Witrak asserts that the trees were planted in response to her long–standing concern for privacy and were totally independent of the remodeling plan. This claim seems disingenuous

---

[14]The weakness of Witrak's position became clear during oral argument when counsel was given the hypothetical removal of the 6–foot wooden fence. Under Witrak's theory the trees would then unquestionably delineate the lot line.

[15]Article 7, section 5 reads in pertinent part:
"All plans and specifications required to be submitted to the Committee shall . . . set forth the following with respect to the proposed structure: the elevation of the structure with reference to the existing and finished lot grade; the general design, the interior layout; the exterior finish materials and color including roof materials; *the landscape plan*; and such other information . . .." (Italics ours.)

considering the timing of planting the trees promptly following rejection of her remodel plans and their resubmission the following day. The claim is even less credible given Witrak's letter to the Homeowners suggesting the trees "improved" the planned remodeling and eliminated the basis for objection. Apparently Witrak assumed that since the trees obstructed the Demings' view and light just as the proposed remodel would have, the remodel should be allowed. Whether the trees are a part of the remodeling plan presents an issue of fact.[16]

While treating the trees as a "fence" or "shrubs" subject to ACC approval seems more harmonious with the overall purposes of the covenants, it remains an issue of fact to be determined after consideration of all relevant evidence. In addition, Witrak's claim that the pertinent covenants have been waived is a possible defense to this action that is yet to be litigated.[17]

Therefore this matter is returned for a trial on the merits. The award of attorney fees will abide the outcome of the trial.

GROSSE, C.J., and KENNEDY, J., concur.

---

[16]Given our decisions regarding article 2, section 8 and article 7, section 5, it is unnecessary to determine if the trees also amount to "improvements" under article 7, section 6. Although a broad definition of "improvements" may include trees, in this case it more likely refers to structures.

[17]Witrak extensively argues that there are many such trees planted at The Lakes and the ACC has never disapproved of these trees. While this does not defeat the Homeowners' claim that trees may be "fences" it could possibly defeat the cause of action.