[No. 33619-3-I.    Division One.    January 17, 1995.]

ROBERT E. HILL, *Appellant*, v. THE DEPARTMENT OF
TRANSPORTATION, *Respondent*.

632

*Jeffrey Cowan*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Paul J. Triesch, Assistant*, for respondent.

SCHOLFIELD, J.* — Robert E. Hill appeals the trial court's order granting summary judgment to the State of Washington Department of Transportation and the Washington State ferries. The order dismissed Hill's maritime claims of negligence and unseaworthiness, his claim of constructive discharge, and his request for declaratory relief because the claims were time barred and Hill failed to exhaust his administrative and statutory remedies. Hill argues that the trial court erred by concluding that his claims were time barred because the continuing tort doctrine had tolled the statute of limitations for his maritime claims, there is no statute of limitations for declaratory actions, and the State never challenged his constructive discharge claim on the ground that it was time barred. Hill also contends the court erred by concluding he failed to pursue his claims through established grievance procedures because his claims did not arise from the applicable collective bargaining agreement (CBA). Finally, Hill argues that the trial court erred by refusing to strike two declarations supporting the State's motion for summary judgment. We affirm.

From March 23, 1979, through December 21, 1989, Robert Hill worked as a seaman on ferries operated by the State Department of Transportation. Throughout his tenure with the Department, Hill was a member of the Inland Boatman's Union (IBU) and was subject to each CBA that the IBU had with the Department. Between 1979 and 1982, Hill worked on the Seattle/Bremerton ferry route, then was transferred to the Fauntleroy/Vashon route.

In 1982, the service hours of the Seattle/Bremerton route were reduced as a result of changes made to the operating budget of the ferry system. Because of the reduced hours, the "B-watch" schedule on the Seattle/Bremerton route was changed to a rotating shift schedule. The Seattle/Winslow route also adopted a rotating schedule, but the remaining

---

*This opinion was filed after the retirement of Judge Jack P. Scholfield, but it was signed by Judge Scholfield prior to his retirement.

seven ferry routes operated by the Department did not. According to Timothy Payne, the former scheduling planner for the Department, and David Black, an assistant port captain, the implementation of the rotating shift schedule was constrained by the requirements of the Collective Bargaining Agreements (CBA's) with both the Masters, Mates and Pilots Union (MM&P) and with the Inland Boatman's Union (IBU). The provisions governing hours of assignment for deck crews in both the MM&P and IBU CBA's imposed several constraints:

1. Each employee with a permanent position must receive 80 hours of pay every two weeks, whether or not they work a full 80 hours;
2. Any work over 80 hours is paid at the overtime rate;
3. Overtime cannot be scheduled;
4. Work periods are to be based on the eight hour day. In cases where running times prevent relief at eight hours, shifts of not less than seven or more than nine hours are permissible (each person must be paid for 80 hours every two weeks which, when coupled with the seven to nine hours condition, dictates that a person will work differing lengths of shifts within a two week 80-hour pay cycle);
5. Work periods must be either five consecutive shifts (days) with two consecutive days off *or* ten shifts (days) with four consecutive days off;
6. An employee must end his/her shift at the same terminal where it started;
7. Work shifts cannot be less than six hours from the end of one shift to the beginning of the next.

Decl. of Timothy Payne.

In February 1984, Hill requested a transfer from the Fauntleroy/Vashon route to the Seattle/Bremerton route. He followed the CBA transfer procedure[1] by using a written "econ-o-

---

[1]Rule 21.07 of the CBA is titled "Filling of Vacancies" and states:

"Employees interested in year-around positions, temporary assignments or temporary promotions, minimum of 30 working days, to a higher classification or pay rate *must notify the Employer and the Union in writing of the positions they wish to fill.* The Employer shall maintain a file of all such requests and, upon receipt of such requests, shall notify in writing the employee submitting such request of its receipt. These requests will be kept active and on file for a period of one (1) year after receipt then placed in the employee's personnel file. The Employees *must indicate in writing their desire to extend the request each subsequent year. . . .*" (Italics ours.) Rule 21.07(A). Open positions are filled according to seniority under rule 21.01.

to request the transfer, which was granted that same month. By the summer of 1984, however, Hill began to experience symptoms of circadian dysrhythmia. Those symptoms included

> prolonged sleep deprivation, chronic insomnia, loss of concentration, lapses of attention and physical injury resulting therefrom, inability to maintain normal family and social functioning, anxiety, severe emotional distress, and physiological disorders.

When he began experiencing the symptoms, Hill complained to his skipper, the dispatcher, the port captain, the safety officer, the assistant superintendent, and other staff members. At one point, Hill verbally asked to transfer from the rotating shift, but he did not use the "econ-o-gram" procedure.[2] According to Hill, there were "no shifts available with better hours", and his dispatcher told him there were no other shifts available at the time. In 1985, Hill informally complained to his union representative, but the representative indicated he was unable to help.[3] Hill never filed a written grievance.

In 1987, a physician confirmed that Hill's symptoms were due to his rotating shifts, and she wrote a letter to the safety officer of the ferry system to alert him of the problems of circadian dysrhythmia. In that letter, the physician noted that Hill's symptoms had disappeared during a 2-week leave of absence from work.

In 1989, Hill decided to resign because of the ongoing symptoms of circadian dysrhythmia. His last day of work as a seaman was December 21, 1989. Hill's medical record

---

[2]Hill also stated during his deposition that from 1984 through April 1987 he had been suffering from circadian dysrhythmia but never attempted during that time to transfer from the Seattle/Bremerton route to a route without rotating shifts.

[3]Under rule 16 of the CBA, step 1 of the grievance procedures is informal and requires the employee, the union, or the union steward to present the grievance orally to the employee's supervisor or designee. Step 2 of the process provides that if the problem is not resolved by the oral grievance, the employee or the union may file a written grievance with the director of employee relations. If necessary, the parties may arbitrate the dispute through step 3.

dated March 30, 1990, indicates that he "[r]ecovered well" after he left his job with the ferry.

On March 31, 1992, Hill filed suit against the Department and the state ferries (hereafter the State) contending that under the Jones Act, 46 U.S.C. app. § 688,[4] the State had negligently breached its duty to provide him with a safe workplace by requiring him to work a schedule with insufficient time off to recover from the adverse physical effects of the rotating shifts. He also alleged that the rotating shifts amounted to an unseaworthy condition on the vessels to which he was assigned. In addition, he sought a declaration of his rights under RCW 47.64.006, the statement of public policy regarding the ferry system's operation and the rights of its employees. In an amended complaint, Hill also alleged constructive discharge.

The State denied Hill's allegations and moved for summary judgment on the grounds that Hill's claims of negligence and unseaworthiness and his claim for declaratory relief were time barred; that those claims and his constructive discharge claim were barred because they were the subject matter of the CBA through which he failed to exhaust his remedies; and that Hill lacked standing to assert a claim for declaratory relief. After hearing oral argument, the trial court concluded

> that [Hill's] maritime claims of unseaworthiness and negligence, and [his] claims of constructive discharge and for declaratory relief are barred and preempted by the applicable statutes of limitation and by [his] failure to pursue those claims through his collective bargaining agreement and/or through mandatory statutory grievance procedures. The [State] is entitled to judgment as a matter of law.

Hill appeals.

I

### THE CONTINUING TORT DOCTRINE

We first address whether the continuing tort doctrine tolled the limitations period for Hill's maritime claims of

---

[4]Under the Jones Act, "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law . . .". 46 U.S.C. app. § 688.

negligence and unseaworthiness so that those claims did not accrue until his last day of employment. Hill argues that the 3-year statute of limitations for maritime actions was tolled by the continuing tort doctrine until the State's allegedly tortious conduct ceased upon his last day of work. He also maintains that the State erroneously relies on the discovery rule to argue that the 3-year statute of limitations began to run when he first discovered that the rotating shift was the source of his injuries. The State argues that the continuing tort doctrine does not apply when the employee's own action — here, Hill's failure to submit a written request for a transfer through the CBA provisions — causes his or her injuries.

An appellate court reviews de novo an order granting summary judgment and, thus, engages in the same inquiry as the trial court. *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). The reviewing court must consider the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Meaney v. Dodd*, 111 Wn.2d 174, 177, 759 P.2d 455 (1988). The motion should be granted only if reasonable persons could reach but one conclusion from all the evidence. *Marincovich*, 114 Wn.2d at 274.

When deciding admiralty matters, state courts must preserve the substantive rights of the parties under federal law. *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 245, 87 L. Ed. 239, 63 S. Ct. 246 (1942). All maritime actions for injuries to seamen have a 3-year statute of limitations under 46 U.S.C. app. § 763a.[5] When a federal cause of action accrues is a matter of federal law. *Lavellee v. Listi*, 611 F.2d 1129, 1130, 52 A.L.R. Fed. 773 (5th Cir. 1980). A cause of action under the

---

[5] 46 U.S.C. app. § 763a provides: "Unless otherwise specified by law, a suit for recovery of damages for personal injury or death, or both, arising out of a maritime tort, shall not be maintained unless commenced within three years from the date the cause of action accrued."

Jones Act and general maritime law "accrues when a plaintiff has had a reasonable opportunity to discover his injury, its cause, and the link between the two." *Crisman v. Odeco, Inc.*, 932 F.2d 413, 415 (5th Cir.), *cert. denied*, 502 U.S. 924, 116 L. Ed. 2d 278, 112 S. Ct. 337 (1991). Thus, the prescriptive period begins to run "when an event occurs that should put a plaintiff on notice to check for injury . . .. This is true even if the event results in only minor physical effects, and applies to Jones Act cases." (Citation omitted.) *Crisman*, 932 F.2d at 415.

Under *Crisman*, Hill's maritime causes of action accrued when he learned of his symptoms of circadian dysrhythmia and their cause. Hill first noticed the symptoms in the summer of 1984, several months after beginning the rotating schedule. In April 1987, he received medical confirmation that the rotating shifts caused his symptoms. Even using April 1987 as the time of accrual, the statute of limitations would have expired in April 1990, and Hill's maritime claims filed in 1992 would be barred.

■ However, in cases involving federal laws other than the Jones Act and 46 U.S.C. app. § 763a, some federal courts have adopted the "continuing tort" doctrine, which tolls the statute of limitations as long as the employer negligently or intentionally continues to inflict new harm upon the plaintiff-employee. *Crisman*, 932 F.2d at 417. Thus,

> "[w]hen a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." Since usually no single incident in a continuous chain of tortious activity can "fairly or realistically be identified as the cause of significant harm," it seems proper to regard the cumulative effect of the conduct as actionable.

(Footnotes omitted.) *Page v. United States*, 729 F.2d 818, 821-22 (D.C. Cir. 1984) (quoting *Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir. 1974), *vacated on other grounds*, 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975); *Fowkes v. Pennsylvania R.R.*, 264 F.2d 397, 399 (3d Cir. 1959)). If the continuing tort doctrine applies on these facts, Hill's maritime claims would not have accrued until December 21,

1989, his last day of employment, and those actions in his complaint filed on March 31, 1992, would not be barred. *See Page*, 729 F.2d at 821-22. To determine the applicability of the continuing tort doctrine here, we must review the relevant federal case law.

In *Page*, on which Hill relies, the plaintiff was a veteran who had received drug therapy from the Veterans Administration (VA) for nearly two decades. 729 F.2d at 821. Page sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (1976 & Supp. V 1981) for medical malpractice, claiming that the VA had wrongfully prescribed addictive drugs to him without proper monitoring throughout the treatment period. The Federal District Court dismissed Page's suit in part because of statutory time limitations. The District of Columbia Court of Appeals reversed that decision because it viewed the VA's alleged conduct as "precisely the sort of continuous conduct accreting physical and mental injury that justifies characterization as a continuing tort." 729 F.2d at 823.

As support for its holding, the *Page* court discussed *Fowkes v. Pennsylvania R.R.*, 264 F.2d 397 (3d Cir. 1959) and *Fletcher v. Union Pac. R.R.*, 621 F.2d 902 (8th Cir. 1980), *cert. denied*, 449 U.S. 1110 (1981). In *Fowkes*, a suit brought under the Federal Employers' Liability Act (FELA), the continuing tort doctrine tolled the statute of limitations on an employee's claim for permanent physical injury due to 28 years of operating an air hammer that produced unpredictable jolts. *Fowkes*, 264 F.2d at 398. The employee had complained frequently to his supervisors about the problem, but they did not correct it. It was only after the employee "successfully bid for lighter work" that he was no longer exposed to the injurious condition. 264 F.2d at 398.

The court relied on the rule set forth in *Urie v. Thompson*, 337 U.S. 163, 93 L. Ed. 1282, 69 S. Ct. 1018, 11 A.L.R.2d 252 (1949) that the statute of limitations does not begin to run in FELA cases until the employee becomes aware of his disease and its cause. *Fowkes*, 264 F.2d at 398. The jury specifically found that Fowkes did not know that the physical condition

for which he sought damages had existed for more than 3 years before he filed his suit. *Fowkes,* 264 F.2d at .398. With regard to the application of the continuing tort doctrine, the court noted, "[t]he important thing is not whether trauma is involved, but whether attributing significant harm to a single incident in a series is reasonable." 264 F.2d at 399. Because no one incident in Fowkes' case "could fairly or realistically be identified as the cause of significant harm", the court concluded that the statute of limitations on his action had not begun to run until Fowkes no longer was exposed to the injurious jolting. 264 F.2d at 399.

In *Fletcher,* the employee worked for the railroad as a section hand. In 1962 he sustained a work-related back injury and over subsequent years received extensive treatment and hospitalization because of it. Nevertheless, the railroad continued to assign Fletcher to the same heavy work as a section hand. In 1973, Fletcher went on leave-of-absence status because of the injury, then returned to work in 1975 as a watchman. 621 F.2d at 905. Fletcher filed suit in 1977 against the railroad under FELA, claiming that the railroad negligently assigned him work more strenuous than he could tolerate given his back injury. 621 F.2d at 907. The railroad argued that the cause of action accrued when Fletcher went on leave-of-absence status in 1973 and the injury-producing work ended, and thus his suit was not filed within the 3-year statute of limitations. The court discussed the issue as follows:

> Where an injury is caused by continuing or repeated acts, the statute of limitations may not begin to run even when the tort is complete. The statute of limitations may be tolled until the tortious conduct ceases, on the theory that one should not be allowed to acquire a right to continue the tortious conduct. An employee's right of action against his employer for personal injuries may be tolled until the last day the employee was subjected to the conditions causing the injury.

(Citations omitted.) 621 F.2d at 908. Because the evidence showed that the railroad continued to assign Fletcher to overly strenuous work contrary to his physician's recommendation and that Fletcher continued to seek a different

assignment, the court concluded that the continuing tort doctrine operated to toll the statute of limitations until the railroad assigned Fletcher to lighter work in 1975. Consequently, Fletcher's 1977 suit was not time barred. 621 F.2d at 908.

However, in *Kichline v. Consolidated Rail Corp.*, 800 F.2d 356 (3d Cir. 1986), the Third Circuit refused to apply the continuing tort doctrine in a FELA case which it distinguished from its earlier decision in *Fowkes*. Kichline, a diesel mechanic for the railroad, had chronic obstructive pulmonary disease. In 1978 or 1979, he learned that his disease was aggravated by exposure to the diesel fumes at work. 800 F.2d at 357. He filed suit against the railroad under FELA in 1983. The trial court granted the railroad's motion for summary judgment on the ground that Kichline's claim was barred by the 3-year statute of limitations. 800 F.2d at 357.

On appeal, the Third Circuit affirmed, following the *Urie* rule that the statute of limitations begins to run for an occupational disease claim brought under FELA when the employee becomes aware of the disease and its cause. *Kichline*, 800 F.2d at 358, 360. The court also noted that *United States v. Kubrick*, 444 U.S. 111, 122, 62 L. Ed. 2d 259, 100 S. Ct. 352 (1979) clarified *Urie*'s discovery rule as follows: " 'the statute of limitations begins to run on the first date that the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress.' " *Kichline*, 800 F.2d at 359 (quoting *Zeleznik v. United States*, 770 F.2d 20, 23 (3d Cir. 1985), *cert. denied*, 475 U.S. 1108 (1986)).

The *Kichline* court consequently rejected Kichline's argument that *Fowkes* required a different outcome because, unlike Kichline, Fowkes was unaware that his physical condition had existed 3 years before he filed suit. 800 F.2d at 359. The court held that

> *Fowkes* can be fairly read as implying that had identification of the injury and its cause occurred before employment terminated, the discovery of injury rather than the cessation of work would have marked the beginning of the limitations period.

> From that viewpoint, *Fowkes* does not support the plaintiff[]s contention that the statute of limitations commenced on his last day of work.
>
> Plaintiff also characterizes the defendant's conduct here as a "continuing tort" and asserts that the statute of limitations did not start to run until the wrongful acts ceased. In other words, he interprets *Fowkes* as holding that the *Urie* test does not apply where employment and exposure to the dangerous condition continue after a claimant becomes aware of his injury and its cause.
>
> We do not accept this construction of *Fowkes* and *Urie*. As noted earlier, in *Fowkes* no event had occurred before cessation of employment that triggered onset of the statutory period. . . .
>
> We understand *Fowkes* to mean that continuing conduct of defendant will not stop the ticking of the limitations clock begun when plaintiff obtained requisite information. On discovering an injury and its cause, a claimant must choose to sue or forego that remedy. This interpretation is supported by *Kubrick*, which requires a plaintiff to take prompt action to seek redress.

(Footnote and citation omitted.) *Kichline*, 800 F.2d at 359-60. *See also National R.R. Passenger Corp. v. Krouse*, 627 A.2d 489, 491, 496 (D.C. 1993) (in reliance on *Kichline*, the court declined to apply the continuing tort doctrine in a FELA case and instead followed the discovery rule under *Urie* and *Kubrick*), *cert. denied,* ____ U.S. ____, 130 L. Ed. 2d 30, 115 S. Ct. 75 (1994).

Similarly, the Fifth Circuit held in *Crisman v. Odeco, Inc.*, 932 F.2d 413, 415 (5th Cir.), *cert. denied,* 502 U.S. 924, 116 L. Ed. 2d 278, 112 S. Ct. 337 (1991) that the employee's suit against his employer under the Jones Act was barred by the 3-year statute of limitations and that the continuing tort doctrine did not apply. 932 F.2d at 418. Beginning in 1970, Crisman experienced respiratory, headache, and sinus problems which he knew were due to various work conditions on Odeco's drilling rigs where he worked as a mechanic. 932 F.2d at 414. He was transferred to another rig where he was exposed to welding fumes that caused him similar problems for 6 years. Crisman never consulted a physician or notified anyone at Odeco about the problem. 932 F.2d at 414. In 1975 or 1976, he was transferred to another rig, and he again

experienced the headaches and respiratory problems from paint fumes and chemicals. It was not until 1979, however, that he consulted a physician and complained to his supervisors and co-workers about his symptoms, but he did not indicate that the symptoms were "anything extraordinary" and never requested a transfer to another job. 932 F.2d at 414.

The trial court entered judgment in favor of Odeco. On appeal, the Fifth Circuit affirmed, holding that Crisman could not avail himself of the continuing tort doctrine because he was aware of his illness and he never alleged that he had requested a transfer to another job or that his employer knew of his physical problems. 932 F.2d at 416, 417. Thus, the court held that Crisman failed to meet his burden of proving that his suit was filed within the prescriptive period. 932 F.2d at 418.

In the present case, Hill knew of his symptoms as early as 1984 and had orally notified the ferry personnel and his union representative of the adverse effects he was experiencing from the rotating shifts. In addition, he orally asked to transfer from the rotating shift because of the symptoms. By 1987, he had medical confirmation that the rotating schedule was the cause of his condition, yet he failed to take the steps required by rule 21.07(A) of the CBA to file a written request to transfer to a different ferry route that did not have rotating shifts. Despite his awareness of the effects of the rotating shifts as early as 1984 and, at the latest, by 1987, Hill did not file his suit against the State until 1992.

Thus, unlike the plaintiff in *Fowkes v. Pennsylvania R.R.*, 264 F.2d 397, 398 (3d Cir. 1959), who did not know of his condition 3 years before filing his lawsuit, Hill clearly was aware of his condition and its cause long before the prescriptive period expired. Because Hill filed his maritime claims more than 3 years after that, the trial court did not err by granting the State's motion for summary judgment on the ground that the two maritime actions were time barred. *See Crisman*, 932 F.2d at 418; *Kichline*, 800 F.2d at 359-60.

## II

### DECLARATORY JUDGMENT

Hill also argues that there is no time limit to when he could bring a declaratory action to obtain judicial clarification of his rights under RCW 47.64.006, the public policy statute under the marine employees act. We need not decide that issue, however, because the actual controversy that Hill asserts — *i.e.*, that the State negligently failed to provide him with a safe workplace and seaworthy vessels, which denied him the right to just and fair working conditions under RCW 47.64.006 — is now moot as he no longer is employed as a marine employee. Thus, any "rights, status or other legal relations" Hill may have had that were affected by RCW 47.64.006 no longer exist, and no final and conclusive judicial determination can be made about them. *See* RCW 7.24.020; *Ronken v. Board of Cy. Comm'rs*, 89 Wn.2d 304, 310, 572 P.2d 1 (1977). Therefore, the trial court did not err by granting summary judgment to the State as to Hill's declaratory judgment claim.

## III

### CONSTRUCTIVE DISCHARGE

As to Hill's claim of constructive discharge, the State concedes that cause of action accrued on Hill's last day of employment with the State (December 21, 1989) and that the action was filed before the statute of limitations expired. *See Douchette v. Bethel Sch. Dist. 403*, 117 Wn.2d 805, 816 n.9, 818 P.2d 1362 (1991) (in a claim for constructive discharge, the date the cause of action accrues "may be the date the employee gives notice to the employer or the last day of actual employment"). The State maintains, however, that the constructive discharge claim arose from the CBA provisions, and Hill failed to exhaust his remedies through the CBA grievance procedures and his statutory remedies. The State argues that all four of Hill's claims were based upon his rotating work shift and therefore are "inextricably intertwined" with the CBA because the work schedule arises directly out of the CBA. Br. of Resp't, at 32. Hill contends

that his claims do not arise out of the CBA but are independent from it and thus are not grievances subject to the CBA grievance procedures. He also maintains that a CBA cannot deprive the superior court of jurisdiction unless a term of the CBA has been violated.

Because we agree with the State that Hill was obligated to pursue his statutory remedies, we need not decide whether Hill's complaint regarding the rotating work shifts is a grievance subject to the CBA grievance procedures. Under RCW 47.64.150,

> [a]n agreement with a ferry employee organization that is the exclusive representative of ferry employees in an appropriate unit may provide procedures for the consideration of ferry employee grievances and of disputes over the interpretation and application of agreements. Negotiated procedures may provide for binding arbitration of ferry employee grievances and of disputes over the interpretation and application of existing agreements. . . .
>
> Ferry system employees *shall follow either the grievance procedures provided in a collective bargaining agreement, or if no such procedures are so provided, shall submit the grievances to the marine employees' commission as provided in RCW 47.64.280.*

(Italics ours.) RCW 47.64.280(2) provides that "[t]he marine employees' commission shall: (a) Adjust all complaints, grievances, and disputes between labor and management arising out of the operation of the ferry system as provided in RCW 47.64.150".[6]

According to the plain language of RCW 47.64.150, a ferry employee must pursue a grievance through the procedures established by his or her employee organization (here, the IBU) unless "no such procedures are so provided". Assuming, arguendo, that Hill's complaint is not a grievance for purposes of the CBA and that he therefore had no grievance procedures available through the CBA, Hill nevertheless was required to pursue a remedy from the marine employees' commission according to RCW 47.64.150 before seeking a remedy at law. Without question, Hill had a grievance or a

---

[6]There is no statutory definition of a grievance under RCW 47.64. *See* RCW 47.64.011.

dispute that arose "out of the operation of the ferry system" (RCW 47.64.280(2)), and therefore the commission had the authority to address Hill's dissatisfaction with the rotating shift. Because Hill never attempted to pursue the remedies available through the marine employees' commission, the trial court did not err by granting summary judgment to the State as to Hill's constructive discharge claim.

## IV

### ADMISSIBILITY OF DECLARATIONS

Finally, we decide whether the trial court erred by refusing to strike the declarations of two ferry employees. Hill maintains that the trial court should have excluded the declarations of Payne and Black because both men lacked credibility and personal knowledge of the contents of their respective declarations. Hill relies on the following segment of Payne's testimony at arbitration proceedings of another matter regarding the hours of work set by a CBA:

A: I couldn't answer that because it is a legal question . . . I can't answer the question because I am not an attorney.

Q: . . . Was it your previous testimony that part of your job requires that you . . . read and interpret contracts and determine how the restrictions in the contract impact your running schedules?

A: My previous testimony was that I have some knowledge of what the contract requires. Interpretation of that contract may come through a whole number of people, including Mr. McIntosh, Mr. Tiberio and Mr. Boyle and whoever else wants to interpret it.

Q: But not sufficient knowledge to answer that last question?

A: Not without the whole thing and guidance from other people.

A review of the transcript in the record shows that Payne was responding to a question about limitations imposed by a "straight watch" provision in a proposed union agreement and possible conflicts involved with it; he was not indicating that he lacked an understanding of the CBA provisions that dealt with scheduling. In addition, both declarants state that they had personal knowledge of the information presented in their declarations. Moreover, Payne, the former scheduling planner for the Department, was the per-

son who actually created the vessel schedules, and according to the arbitration transcript, he had to have a working knowledge of the CBA provisions to do that. Thus, we cannot say that the trial court abused its discretion by considering the two declarations. *See Maehren v. Seattle*, 92 Wn.2d 480, 488, 599 P.2d 1255 (1979) (the admission or refusal of evidence lies largely within the trial court's sound discretion), *cert. denied*, 452 U.S. 938 (1981).

The trial court's order granting the State's motion for summary judgment is affirmed.

GROSSE and KENNEDY, JJ., concur.

Review denied at 126 Wn.2d 1023 (1995).