[No. 44894-3-I. Division One. August 14, 2000.]

MICHAEL PIEPKORN, ET AL., *Appellants*, v. DANIEL ADAMS, ET AL., *Respondents*.

---

[14] We deny McGuire's request for RCW 4.84.370(1) attorney fees.

674

*Christopher I. Brain* and *Marion E. Morgenstern* (of *Tousley Brain P.L.L.C.*), for appellants.

*Jeffrey T. Broihier* (of *Broihier & Wotipka*), for respondents.

KENNEDY, J. — Mary Anne and Daniel Adams (hereinafter sometimes referred to collectively as Adams) live in a residential development that is subject to restrictive covenants. One covenant prohibits any structures from being erected, placed, or altered on any lot unless the development's Architectural Control Committee approves the structure's construction plans. And another covenant states that lot-line fences are permitted, subject to Committee approval. Although the Committee disapproved Adams's request for permission to construct a lot-line fence on his lot, Adams constructed the fence anyway. Adams's neighbors, Michael Piepkorn and Shelley Desmond (hereinafter sometimes referred to collectively as Piepkorn) filed a complaint against Adams, requesting injunctive relief and damages. Both sides moved for summary judgment. The trial court denied Piepkorn's motion, and granted summary judgment to Adams, dismissing Piepkorn's complaint. Piepkorn appeals.

Contrary to Adams's contentions, the Committee was authorized to disapprove construction plans for the fence, based on the height and location of the fence. As a result, Adams is not entitled to judgment as a matter of law on Piepkorn's claim for injunctive relief. Instead, Piepkorn is

entitled to injunctive relief as a matter of law. Thus, we reverse the trial court's summary judgment dismissing Piepkorn's claim for injunctive relief, and the trial court's award of attorney fees and costs to Adams. Further, we reverse the trial court's order denying summary judgment for injunctive relief to Piepkorn, and remand for entry of summary judgment in favor of Piepkorn on that claim, and for the trial court's determination of the appropriate injunctive relief to be granted. We nonetheless affirm the trial court's dismissal of Piepkorn's claim for damages because Piepkorn failed to demonstrate entitlement to an award of damages in this case. As the substantially prevailing party in this appeal, Piepkorn is entitled to an award of reasonable attorney fees, below and on appeal.

## FACTS

Appellants Michael Piepkorn and Shelley Desmond, husband and wife, and Respondents Daniel and Mary Anne Adams, husband and wife, are neighbors in Bellmonte Park, a residential development located in Woodinville, Washington. Properties located in Bellmonte Park are subject to numerous restrictions, including a restrictive covenant that prohibits any structure from being "erected, placed, or altered on any Lot" unless Bellmonte Park's Architectural Control Committee approves the construction plans. Clerk's Papers at 32 (Art. 2 § 6). Bellmonte Park properties are permitted to have "[f]ences, walls or shrubs . . . along lot lines of each Lot, subject to Committee approval[.]" *Id.* (Art. 2 § 5). The covenants also state that the "Committee or any Owner shall have the right to enforce, by any legal proceeding, all restrictions, conditions, covenants, reservations, liens and charges[.]" *Id.* at 35. The covenants further provide that the prevailing party in any action to enforce the covenants shall be entitled to reasonable attorney fees, expert witness fees, and costs.

On February 11, 1998, Adams submitted construction plans to the Committee, seeking approval to build a six-foot

cedar fence that would run along the lot lines of the Adams's property. On March 4, 1998, the Committee disapproved this request, asking Adams to "re-consider the option of compromising the portion of fence extending 73' to the front of the property." *Id.* at 44. According to Dan Adams, he responded to the Committee's request by submitting revised construction plans that, inter alia, "reduced the length 7 feet to 66 total feet that portion of fence extending 73' to the front of the property[.]" *Id.* at 45. Attached to these revised plans is a letter to the Committee from Dan Adams, which is dated March 30, 1998, stating, "I will proceed with construction. Please contact me immediately if you do not agree with the contents of this letter." *Id.* None of the members of the Committee received this letter until Adams produced it during discovery for this case. Moreover, Adams's revised construction plans are dated May 19, 1998. Nonetheless, Adams maintains that, having received no response from the Committee, he began constructing the fence on May 6, 1998. Adams's neighbors, Piepkorn and Desmond, learned about Adams's fence for the first time on this date.

On May 11, 1998, the Bellmonte Park Homeowners' Association held a meeting to discuss Adams's fence. According to Desmond and others who attended the meeting, Dan Adams, who was present at the meeting, did not mention any revised plans and "was adamant that he was going to construct the fence as it was and he would not modify it." *Id.* at 155. The day after this meeting, the Committee sent a letter to Adams that stated, "Based on both this meeting, and the original plans submitted by Mr. Dan Adams, via February 11, 1998, letter; the architectural committee continues to support the position of non-approval of the plans." *Id.* at 47.

In November 1998, the Committee sent Dan Adams a letter informing him that his fence "remains unapproved[.]" *Id.* at 48. This letter advised Adams that he needed to move the fence in order to obtain Committee approval:

In order to acquire approval[,] your fence must be moved so

that it is parallel with the back of your house on the left side (as viewed from the street). The right side should be moved so it runs off the back of the garage parallel with the right side of the garage. Any portion of the fence that can be seen from the street must also be hidden from view. The northern line of your fence should be set back from the driveway of Lot 9 in order to reduce the adverse visual impact on your neighbors. The back portion of the fence must be set back 20 ft from back lot line as noted on your title. This is for equestrian trail easement. . . . It is the opinion of the Architectural [Committee] that fences should not be placed in front of homes in our development.

*Id.* Despite this, Adams did not move the fence.

In December 1998, Piepkorn filed a complaint against Adams in King County Superior Court, requesting injunctive relief and damages. Piepkorn moved for summary judgment on their claim for injunctive relief, and Adams moved for summary judgment dismissing the complaint. On June 10, 1999, the trial court denied Piepkorn's motion, granted Adams's motion, and awarded Adams $10,553.62 in attorney fees. Piepkorn appeals, and both parties request attorney fees on appeal.

## DISCUSSION

### I. Disapproval of Adams's Fence

■ Piepkorn contends that the trial court erred by denying summary judgment on the claim for injunctive relief and granting Adams's motion for summary judgment dismissal of the complaint. Specifically, Piepkorn maintains that the Committee was authorized to disapprove the construction of Adams's fence.[1] "An appellate court reviews de novo an order granting summary judgment and, thus,

---

[1] In response, Adams argues, inter alia, that fences are not subject to Committee approval because they are appropriately characterized as landscaping, which is not mentioned in Bellmonte Park's restrictive covenants, rather than structures, which must be approved by the Committee. Because Bellmonte Park's restrictive covenants define "structure" as "any thing [sic] which is built or constructed[,]" Clerk's Papers at 31, and because the covenants specifically state that "[a]ll fences, open and solid, are to meet the standards set by the Committee," *Id.* at 32, we summarily reject this argument.

engages in the same inquiry as the trial court." *Hill v. Department of Transp.*, 76 Wn. App. 631, 637, 887 P.2d 476 (1995).

### A. Right to Build a Lot-Line Fence

■ Adams avers that the Association's restrictive covenant that authorizes Bellmonte Park properties to have "[f]ences, walls or shrubs . . . along lot lines of each Lot, subject to Committee approval" gives him an affirmative right to construct a fence along his lot line without Committee interference. But the language authorizing fences on property lines is qualified by the phrase "subject to Committee approval[.]" Clerk's Papers at 32.[2] We therefore reject Adams's strained interpretation of this covenant. The phrase, "along lot lines of each Lot," does not preclude the Committee from exercising discretion with respect to setbacks, by way of one example, or with respect to height, with respect to another example, or to preserve aesthetics for yet a third example. The covenants specifically authorize the Committee to condition approval of any structure upon "harmony with existing structures." *Id.* We therefore reject Adams's argument that this restrictive covenant gives an unrestricted right to build fences on lot lines.

### B. The Association's General and Specific Covenants

The parties dispute the interpretation of Art. 2 § 5 and Art. 2 § 6 of Bellmonte Park's "Declaration of Protective Covenants, Restrictions, Easements, and Agreements." Piepkorn contends that Art. 2 § 6 authorizes the Committee to disapprove the location of Adams's fence, notwithstanding the language specifically addressing fences in Art. 2 § 5.

---

Adams also contends that the Committee's decision was unfair because Michael Piepkorn was a member of the Committee. Because the record contains unrefuted evidence that Michael Piepkorn did not join the Committee until after the Committee decided the issues relevant to this appeal, we summarily reject this argument.

[2] In light of this plain language, we summarily reject Adams's contention that Bellmonte Park's restrictive covenants provided no notice that "fences may be prohibited or restricted by the Architectural Committee[.]" Resp't's Br. at 21.

By contrast, Adams argues that the Committee does not have the authority to order him to move the fence because the specific language in Art. 2 § 5 limits the general power given by Art. 2 § 6.

Art. 2 § 5 states: "Fences, walls or shrubs are permitted along lot lines of each Lot subject to Committee approval . . . . All fences, open and solid, are to meet the standards set by the Committee." Clerk's Papers at 32 (Art. 2 § 5). And under Art. 2 § 6, the Committee is authorized to approve any Bellmonte Park structure, considering, inter alia, location with respect to topography and finish grade elevations and front landscape:

> No Structure shall be erected, placed or altered on any Lot until the construction plans and specifications and a plan showing the location of the Structure have been approved by the Committee as to requirements of this Article and harmony with existing Structures, and location with respect to topography and finish grade elevations and front landscape.

*Id.* (Art. 2 § 6).

█ "Restrictive covenants are designed to make residential subdivisions more attractive for residential purposes. . . ." *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 699, 974 P.2d 836 (1999). "Covenants providing for consent before construction or remodeling [will be] upheld . . . so long as the authority to consent is exercised reasonably and in good faith." *Riss v. Angel*, 131 Wn.2d 612, 624, 934 P.2d 669 (1997). Nonetheless, "a homeowners' association may not impose restrictions under a general consent to construction covenant which are more burdensome than provided for by specific objective restrictive covenants." *Id.* at 638. Specific restrictions involve "a nondiscretionary, ministerial procedure." *Id.* at 625.

█ The issue here is whether Bellmonte Park improperly imposed restrictions under a general consent to construction covenant that are more burdensome than provided for by a specific objective restrictive covenant. As an initial matter, Adams contends that Art. 2 § 6—which

authorizes the Committee to approve any Bellmonte Park structure, considering, inter alia, location with respect to topography, finish grade elevations, and front landscape—is a general covenant, and Art. 2 § 5—which permits Bellmonte homeowners, subject to Committee approval, to build fences along the lot lines of each lot—is a specific restrictive covenant. Piepkorn disputes these characterizations, maintaining that Art. 2 § 5 does not involve "a nondiscretionary, ministerial procedure." *Riss*, 131 Wn.2d at 625. We agree with Piepkorn. By its terms, Art. 2 § 5 is discretionary, i.e., subject to Committee approval. Moreover, Art. 2 § 6 is not more burdensome than Art. 2 § 5. Both sections require Committee approval and neither section gives property owners an absolute right to build a fence in any particular location.

Thus, we conclude that the language addressing fences in Art. 2 § 5 does not limit the general power given by Art. 2 § 6. Accordingly, Art. 2 § 6 authorizes the Committee to disapprove the location of the Adams fence, notwithstanding the language addressing fences in Art. 2 § 5.

*C. Discretion of the Association's Architectural Committee*

Piepkorn maintains that the Committee had the authority to disapprove Adams's construction plans based on the height and location of the fence, specifically requiring Adams to set the fence back from the left, right, and back sides of the lot; hide it from view; and remove it from the front of the lot. In response, Adams maintains that the Committee's disapproval was arbitrary and unreasonable because its disapproval was not based on the specific factors that are listed in Art. 2 § 6, i.e., "location with respect to topography and finish grade elevations and front landscape." Clerk's Papers at 32.

"[W]here construction of restrictive covenants is necessitated by a dispute not involving the maker of the covenants, but rather among homeowners in a subdivision governed by the restrictive covenants, rules of strict con-

struction against the grantor or in favor of the free use of land are inapplicable." *Riss*, 131 Wn.2d at 623. "Ambiguity . . . may be resolved by considering evidence of the surrounding circumstances[, but] [t]he court will place 'special emphasis on arriving at an interpretation that protects the homeowners' collective interests.' " *Id.* at 623-24 (citations omitted). Although extrinsic evidence is not admissible to modify the language of the restriction, *Hollis*, 137 Wn.2d at 699, a "covenant should not be read in such a way that defeats the plain and obvious meaning of the restriction." *The Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 180, 810 P.2d 27 (1991) (footnote omitted). Indeed, the *Witrak* court cited with approval the Missouri Court of Appeals' determination that, despite the literal definitions of the words of a restriction, "a fence which obstructed the view of neighbors was a 'building' as contemplated in a setback restriction." *Id.* (citing *Thomas v. Depaoli*, 778 S.W.2d 745, 748 (Mo. Ct. App. 1989)).

Nearly all the restrictive covenants in Bellmonte Park restrict the appearance of each lot by requiring roof, siding, and trim of house to be wood color; mandating committee approval for fences, walls, shrubs, or any structures; and prohibiting outbuildings, vehicles parked on the street, signs displayed in public view, and above-ground wiring. Thus, the overall purpose of these restrictions is to protect the aesthetic harmony of the community. *Cf. The Lakes*, 61 Wn. App. at 181 (explaining the overall purpose of a Homeowners' Association's restrictions). To control the appearance of the community, nearly all changes affecting the exterior of the lots—including the construction of lot-line fences—are conditioned upon Committee approval.

Adams contends that a literal reading of the factors listed in Art. 2 § 6, i.e., "location with respect to topography and finish grade elevations and front landscape[,]" must be construed to limit the Committee's discretion to only the listed factors. *Cf. In re Eaton*, 110 Wn.2d 892, 898, 757 P.2d 961 (1988) ("[W]here a statute designates a list of things whereupon the statute operates, the inference arises that

the Legislature intended to omit other things not listed[.]"). But as discussed above, a "covenant should not be read in such a way that defeats the plain and obvious meaning of the restriction." *The Lakes*, 61 Wn. App. at 180 (footnote omitted). Moreover, the same sentence that refers to factors of "location with respect to topography and finish grade, elevations and front landscape" also refers to "harmony with existing structures." That factor would be rendered meaningless by Adams's proposed construction. To best honor the homeowners' collective interests as reflected in the Bellmonte Park restrictive covenants, we conclude that the covenants authorize the Committee to restrict the placement of fences to best protect the aesthetic harmony of the community. Therefore, we conclude that the Committee had the authority to disapprove Adams's construction plans based on the height and location of the fence. Accordingly, Adams is not entitled to judgment as a matter of law on Piepkorn's claim for injunctive relief.

## II. Enforcement of the Restrictive Covenants

Piepkorn contends that he is entitled to judgment as a matter of law on the claim for injunctive relief because "the Committee's decision disapproving the Adams' fence is valid and enforceable[.]" Appellants' Br. at 34. We agree.

■■ ■■ "Restrictive covenants . . . are enforceable by injunctive relief." *Hollis*, 137 Wn.2d at 699. "To establish the right to an injunction, the party seeking relief must show (1) that he or she has a clear legal or equitable right, and (2) that he or she has a well-grounded fear of immediate invasion of that right." *Id.* Nonetheless, a court must balance the equities before it grants an injunction against an "innocent defendant who proceeds without knowledge or warning that his [or her] activity encroaches upon another's property rights." *Id.* at 700.

■■ ■■ As discussed above, Bellmonte Park's "Declaration of Protective Covenants, Restrictions, Easements, and Agreements" authorized the Committee to disapprove

Adams's construction plans based on the height and location of the fence, and the Committee did disapprove the plans. But Adams built the fence anyway. Piepkorn, who owns property in Bellmonte Park, has "the right to enforce, by any legal proceeding, all restrictions, conditions, covenants, reservations, liens, and charges[.]" Clerk's Papers at 35. Thus, Piepkorn has established both a clear legal or equitable right and a well-grounded fear of immediate invasion of that right—indeed, the right has already been invaded.

The record reflects that the Commission notified Adams in writing that the fence was not approved before Adams began constructing the fence, during the construction, and after the fence was completed. Adams is not an innocent defendant who proceeded without knowledge or warning that his fence encroached upon another's property rights. Accordingly, Adams is not entitled to a balancing of the equities in this case.

We conclude that Piepkorn is entitled to judgment as a matter of law on his claim for injunctive relief. Accordingly, we reverse the order denying Piepkorn's motion for summary judgment establishing the right to injunctive relief and remand this case to the trial court for a determination of the appropriate injunctive relief.

## III. Damages

 Piepkorn asserts that he is entitled to an award of damages "for the loss of value and use and enjoyment of [their property] caused by the Adams's violation of the Covenants." Appellants' Br. at 38. Piepkorn and Desmond brought suit to enforce Bellmonte Park's covenants under the authority of the Bellmonte Park's Declaration. But this Declaration contains no damages provision. Indeed, as discussed above, courts enforce restrictive covenants by awarding injunctive relief. *Hollis*, 137 Wn.2d at 699. In Piepkorn's complaint, he alleged that the "Adams' actions in constructing their fence in direct violation with the

Restrictive Covenants, while it remains, has reduced the value of [his] property and damaged [his] use thereof, for which [he is] entitled to compensation." Clerk's Papers at 6-7. But he did not assert to the trial court or on appeal, any legal basis on which he would be entitled to damages.

Therefore, Piepkorn failed to demonstrate that he is entitled to an award of damages in this case. Accordingly, we conclude that the trial court properly dismissed the damages portion of Piepkorn's complaint.

## IV. Attorney Fees

After the trial court granted Adams's motion for summary judgment dismissing Piepkorn's complaint, it awarded "reasonable attorney fees" to Adams in the amount of $10,553.62. Piepkorn seeks reversal of this award and contends that he is entitled to reasonable attorney fees and costs under Bellmonte Park's covenants and RAP 18.1.

According to Bellmonte Park's "Declaration of Protective Covenants, Restrictions, Easements, and Agreements," the prevailing party in a legal action to enforce Bellmonte Park's provisions is entitled to recover attorney fees, expert fees, and costs:

> In any legal action commenced in order to enforce the provisions of this Declaration, the prevailing party shall be entitled to recover all reasonable attorney's fees and expert witness fees incurred in order to enforce the provisions of this Declaration. The prevailing party shall also be entitled to recover all costs.

Clerk's Papers at 36. "In general, a prevailing party is one who receives an affirmative judgment in his or her favor." *Riss*, 131 Wn.2d at 633. "If neither party wholly prevails then the party who substantially prevails is the prevailing party, a determination that turns on the extent of the relief afforded the parties." *Marassi v. Lau*, 71 Wn. App. 912, 916, 859 P.2d 605 (1993).

Here, although we have affirmed the trial court's dismissal of Piepkorn's claim for damages, we have con-

cluded that Piepkorn is entitled to injunctive relief. Piepkorn is the substantially prevailing party in this action to enforce Bellmonte Park's restrictive covenants. Accordingly, he is entitled to an award of reasonable attorney fees, below and on appeal. We reverse the trial court's $10,553.62 award to Adams. Upon remand, the trial court shall fashion appropriate injunctive relief, and award judgment to Piepkorn for his reasonable attorney fees and costs below. A commissioner of this court shall determine the sum of reasonable attorney fees upon appeal, upon Piepkorn's timely compliance with the applicable Rules of Appellate Procedure.

BAKER and ELLINGTON, JJ., concur.