# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| VIEW RIDGE ESTATES HOMEOWNERS ASSOCIATION, a Washington nonprofit corporation,<br><br>Appellant,<br><br>v.<br><br>WALTER GUETTER and MARIANN GUETTER, a married couple,<br><br>Respondents,<br><br>RONALD A. HAERTL and LESLIE KOLISCH,<br><br>Intervenors. | DIVISION ONE<br><br>No. 85897-1-I<br><br>PUBLISHED OPINION |

DWYER, J. — This matter involves Walter and Mariann Guetter's challenge to View Ridge Estates Homeowners Association's adoption of a view obstruction covenant implicating certain trees on the Guetters' property. Their challenge relies on our Supreme Court's decision in Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 327 P.3d 614 (2014), thereby requiring that we determine whether View Ridge Estates' governing covenants granted its members the authority to adopt new covenants or only to change its existing covenants, whether the view obstruction covenant adopted herein constituted an entirely new covenant or simply a change to View Ridge Estates' existing covenants, and whether View Ridge Estates obtained the requisite support from its members to adopt such a covenant. Concluding that View Ridge Estates' governing

covenants authorized its members to change its existing covenants, that the adopted view obstruction covenant—by increasing certain view obstruction restrictions already in place—constituted a change to its existing covenants, and that View Ridge Estates' members obtained the requisite support of its members to adopt such a change, we affirm the trial court's summary judgment orders.[1]

The Guetters also appeal from the trial court order granting awards of attorney fees and costs to the prevailing parties. They assert that the trial court did not adequately address their objections to the prevailing parties' requests for such awards. We agree.

Therefore, we affirm in part, reverse in part, and remand the matter to the trial court for it to readdress its prior award of attorney fees and costs.

I

In 1982, View Ridge Estates Homeowners Association recorded a declaration in Clark County announcing certain covenants, conditions, and restrictions on its land.[2] That declaration included the following:

> Amendment. The covenants and restrictions of this Declaration shall run with and bind the land . . . . The covenants and restrictions of this Declaration *may be amended* during the first twenty (20) year period [from the date this declaration is recorded] by an instrument signed by not less than ninety (90) percent of the Lot Owners, *and thereafter by an instrument signed by not less than seventy-five (75) percent of the Lot Owners. Any proposed amendment* must be consistent with the approved development

---

[1] As discussed infra we also conclude that the Guetters have waived their right to challenge whether they are in breach of the adopted covenant herein, and we affirm the trial court's order imposing the equitable relief in question stemming from the court's summary judgment orders.

[2] The 1982 declaration was amended four years later. For the purpose of the matter on appeal, the 1982 and 1986 declarations are functionally equivalent and we need not distinguish between them.

plan for the P.U.D. and may not contravene the City of Camas P.U.D. Ordinance and must be properly recorded.

(Emphasis added.)

As pertinent here, the declaration also set forth a provision titled "Use Restrictions," which reads as follows:

> Section 1. Enjoyment of Property.  The owners shall use their respective properties to their enjoyment in such a manner *so as not to offend or detract from other Owner's enjoyment of their own respective properties*.
> . . . .
> Section 13. Views.  If any outbuilding or fence is not subject to the architectural committees['] approval it shall be designed and constructed in such a fashion *so as not to materially obstruct the view of any other lot owner* and, in no event shall any fence be any greater than six feet in heighth.

(Emphasis added.)

In 2004, the Guetters bought a plot of land within View Ridge Estates that included within its boundaries a house and several trees.

In 2018, a View Ridge Estates committee initiated and completed a draft document setting forth a restatement of View Ridge Estates' previously recorded declaration.  As pertinent here, the draft restated declaration contained a covenant that reads as follows:

> No trees or other vegetation, in a view and/or view corridor area, shall be taller than a maximum of fifteen (15) feet or the first story gutter height in the front or back yard of any home, whichever is shorter, where the tree or other vegetation is located, nor shall any trees or other vegetation be taller than a maximum of six (6) feet between any homes if in a view or view corridor.  If trees and other vegetation comply with these limits, they are expressly permitted. Taller trees and shrubs are permitted so long as no Member's view is unreasonably obstructed by the taller trees or shrubs.

3

The draft restated declaration also provided for a landscape committee whose duties included resolving disputes regarding view obstructions. The draft declaration gave every member "the right to notify [the committee] at any point in time if he/she feels that there is a view obstruction occurring by overgrown vegetation whether it is within the Membership Lots and/or the Common Areas." When notified of such a situation, the draft declaration indicated that the committee "shall make its best efforts to help the Membership, and assist the Board, to reasonably protect, preserve and enhance our views and view corridors and *to resolve any view obstruction issue by attempting to formulate an agreed plan of action in writing with the affected Members.*" (Emphasis added.) In so doing, the committee would take "into account all of the affected Members' opinions and perspectives, and the relevant facts and issues surrounding any particular view obstruction issue, including any old and/or new photos of such views if available." In the event that the committee was unable to "resolve the view obstruction issue by agreement between the affected Members," the committee would issue its written decision and provide affected members the opportunity to appeal the matter to View Ridge Estates' board.[3]

Thereafter, in the summer of 2018, View Ridge Estates sought to obtain member support for the draft restated declaration and the association ultimately gathered signatures from nearly all—but not all—of its 46 members.[4] The restated declaration was duly recorded in Clark County.

---

[3] On appeal, the Guetters do not challenge the validity of these procedures provided in the restated declaration.

[4] The signature sheet in question reflects that View Ridge Estates obtained support from 45 out of 46 of its members, including the Guetters. On appeal, the Guetters dispute the validity

4

Five months later, certain View Ridge Estates members—including Ronald Haertl and Leslie Kolisch—notified the landscape committee that certain trees located on the Guetters' property were obstructing their view of the Columbia River and of Mt. Hood in violation of the newly adopted view obstruction covenant. The committee contacted the Guetters in an attempt to resolve the members' complaint. The Guetters declined to participate in that process, indicating that they did not intend to allow members of the committee onto their property and refusing to comply with the view obstruction covenant.[5]

The landscape committee thereafter determined that nine of the Guetters' trees were in violation of the view obstruction covenant and directed the Guetters to top, trim, or remove those trees. The Guetters appealed the committee's determination to View Ridge Estates' board, which denied their appeal. In a letter responding to the board's denial, the Guetters stated, that "the [homeowners' association] can expect us to hold our position and we will NOT conform with your new [restrictive covenants] when it comes to tree removal on our property." The Board sent the Guetters a demand letter. The Guetters did not respond.

View Ridge Estates subsequently filed a complaint in Clark County Superior Court alleging both that the Guetters were in breach of the newly adopted view obstruction covenant and requesting injunctive relief requiring the

---

of their signatures. However, as discussed infra, addressing that dispute is not necessary to our resolution of this matter.

[5] The Guetters stated that removal of the trees would significantly erode the soil conditions underlying their property, requiring them to take on a significant financial burden in order to remediate their property.

Guetters to trim, top, remove, or otherwise modify the trees in question. The Guetters filed an answer with affirmative defenses. Haertl and Kolisch later filed a motion to intervene, which the superior court granted.[6]

A few months later, View Ridge Estates filed a motion for summary judgment, joined by Haertl and Kolisch, which the trial court granted. The Guetters later filed a motion for partial summary judgment, which the trial court denied. The superior court then issued an injunction ordering the Guetters to "trim, top, or[ ]remove trees on their lot in the manner set forth in the decision of [View Ridge Estates'] Landscape Committee."[7]

Thereafter, View Ridge Estates and Haertl and Kolisch requested an award of attorney fees and costs, which the Guetters opposed on several grounds. The trial court—without responding to the Guetters' objections—granted the award requests.

The Guetters now appeal.[8]

II

The Guetters assert that the trial court erred by granting View Ridge Estates' motion for summary judgment because View Ridge Estates' adoption of the view obstruction covenant was invalid. This is so, according to the Guetters, because View Ridge Estates' governing covenants only authorized its members to change its covenants, the view obstruction covenant adopted by the

---

[6] Haertl and Kolisch filed a complaint mirroring that of View Ridge Estates' complaint, except for the addition of a request for damages arising from their obstructed view. They later withdrew their request for damages.

[7] The Guetters filed a motion for reconsideration, which the trial court denied.

[8] The Guetters appealed this matter to Division Two of this court. Thereafter, the matter was transferred to Division One for consideration.

association constituted an entirely new covenant, and the association needed unanimous consent to adopt such a covenant, which it did not obtain.

The Guetters are incorrect. Although the Guetters properly identify that View Ridge Estates' governing covenants only authorize its members to change its covenants, the view obstruction covenant adopted herein resulted only in an increase to restrictions already in place. Therefore, rather than creating an entirely new covenant, the adopted covenant constituted only a change to View Ridge Estates' existing covenants, a change which the association gathered sufficient support to validly adopt.

A

The matter before us involves the interpretation of restrictive covenants. The court in Wilkinson described the applicable standard as follows:

> Interpretation of a restrictive covenant presents a question of law. Wimberly v. Caravello, 136 Wn. App. 327, 336, 149 P.3d 402 (2006). We apply the rules of contract interpretation. Id. While Washington courts once strictly construed covenants in favor of the free use of land, we no longer apply this rule where the dispute is between homeowners who are jointly governed by the covenants. Riss v. Angel, 131 Wn.2d 612, 621-24, 934 P.2d 669 (1997). This change in approach was driven by the recognition that "'[s]ubdivision covenants tend to enhance, not inhibit, the efficient use of land.'" Mains Farm Homeowners Ass'n v. Worthington, 121 Wn.2d 810, 816, 854 P.2d 1072 (1993) (quoting Robert D. Brussack, *Group Homes, Families, and Meaning in the Law of Subdivision Covenants*, 16 GA. L. REV. 33, 42 (1981)); see also Green v. Normandy Park Riviera Section Cmty. Club, 137 Wn. App. 665, 683, 151 P.3d 1038 (2007). Rather than place a thumb on the scales in favor of the free use of land, "[t]he court's goal is to ascertain and give effect to those purposes intended by the covenants." Riss, 131 Wn.2d at 623. Courts "place 'special emphasis on arriving at an interpretation that protects the homeowners' collective interests.'" Id. at 623-24 (quoting Lakes at

7

Mercer Island Homeowners Ass'n v. Witrak, 61 Wn. App. 177, 181, 810 P.2d 27 (1991)).

Thus, our primary objective in contract interpretation is determining the drafter's intent. Hollis v. Garwall, Inc., 137 Wn.2d 683, 696, 974 P.2d 836 (1999); Riss, 131 Wn.2d at 623; Mains Farm, 121 Wn.2d at 815. "While interpretation of the covenant is a question of law, the drafter's intent is a question of fact." Ross v. Bennett, 148 Wn. App. 40, 49, 203 P.3d 383 (2008) (citing Wimberly, 136 Wn. App. at 336). "But where reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." Id. at 49-50 (citing Owen v. Burlington N. Santa Fe R.R., 153 Wn.2d 780, 788, 108 P.3d 1220 (2005)). In determining the drafter's intent, we give covenant language "its ordinary and common use" and will not construe a term in such a way "so as to defeat its plain and obvious meaning." Mains Farm, 121 Wn.2d at 816; Riss, 131 Wn.2d at 623. We examine the language of the restrictive covenant and consider the instrument in its entirety. Hollis, 137 Wn.2d at 694 (quoting Mountain Park Homeowners Ass'n v. Tydings, 125 Wn.2d 337, 344, 883 P.2d 1383 (1994)); Wimberly, 136 Wn. App. at 336.

180 Wn.2d at 249-51.

1

The Guetters' challenge to the validity of View Ridge Estates' adoption of a restrictive covenant requires that we look to our Supreme Court's decision in Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, for guidance. At issue therein was the validity of the vote by the majority of a homeowners' association's members to adopt a covenant prohibiting the short term rental of its residences. Wilkinson, 180 Wn.2d at 245. As part of its analysis, the court reviewed the applicable governing covenants and found that a majority of its members were only authorized "'to change these protective restrictions and covenants in whole or in part.'" Wilkinson, 180 Wn.2d at 256. Given that, the court concluded that the association's governing covenants did not authorize its members to create an entirely new covenant. Wilkinson, 180 Wn.2d at 256-57.

The court cautioned that, when a governing covenant only authorizes its members to change existing covenants but those association's members seek to adopt a new covenant, unanimous member support would be required. Wilkinson, 180 Wn.2d at 258.

The court also compared the text of that association's existing covenants against the text of the adopted covenant at issue to determine if the adopted covenant was new or simply a change to those covenants already in place. In so doing, the court found that those existing covenants permitted short term rentals whereas the adopted covenant did not.[9] Wilkinson, 180 Wn.2d at 248. The court concluded that the adopted covenant's short-term rental prohibition effectively eliminated its members' ability to rent their residences for a short rental term. Therefore, according to the court, the adopted covenant was not a change to existing covenants but, rather, the creation of an entirely new covenant. Wilkinson, 180 Wn.2d at 257-58.

Given the foregoing, the court concluded that the adopted covenant was invalid. The governing covenants therein only authorized a majority of its members to change existing covenants and did not authorize them to create new covenants. Given that the adopted covenant constituted a new covenant, the association needed unanimous consent of its members to adopt that covenant, but they had only obtained majority support. Accordingly, the court ruled, the

---

[9] The adopted covenant therein restricted members from renting their residences for less than one month or 30 continuous days. Wilkinson, 180 Wn.2d at 248.

9

majority vote adopting the covenant prohibiting short term rentals was invalid. Wilkinson, 180 Wn.2d at 262.

2

The first published case following Wilkinson's mode of analysis was Twin W Owners' Ass'n v. Murphy, 26 Wn. App. 2d 494, 529 P.3d 410, review denied, 1 Wn.3d 1032 (2023). In Murphy, the issue before Division Three of this court was "the same question resolved by the Washington Supreme Court in Wilkinson: whether a homeowner association may amend its restrictive covenants to ban or highly regulate the use of a residence as a vacation rental." 26 Wn. App. 2d at 497. The court reviewed the applicable governing covenants and found that those covenants authorized "[a]mendment" of covenants but did not "expressly reserve[] to the homeowner association the power to add new covenants."[10] Murphy, 26 Wn. App. 2d at 499, 510-11. The court thus concluded that the association's members were only authorized to change existing covenants, implicitly interpreting "amendment" to mean "change." Murphy, 26 Wn. App. 2d at 499, 510-11.

The court also reviewed the association's existing covenants and the adopted covenant therein and concluded that the adopted covenant was new because the existing covenants did not restrict or regulate short term rentals but the adopted covenants did. Murphy, 26 Wn. App. 2d at 500-03, 510. Therefore, because the governing covenants only authorized a change to existing

---

[10] The governing covenants in Murphy required a 60 percent vote of its members in order to amend its covenants. 26 Wn. App. 2d at 499.

covenants and the adopted covenant was a new covenant, the court ruled that the supermajority vote in support of the adopted covenant was insufficient to validly adopt such a covenant—unanimous consent was necessary. Murphy, 26 Wn. App. 2d at 508-11. The court thus concluded that the vote therein was invalid. Murphy, 26 Wn. App. 2d at 508-11.

3

Emerging from the considerations in both Wilkinson and Murphy is a framework for analyzing the validity of an adopted covenant. In that framework, a reviewing court first asks whether a homeowners' association's governing covenants authorize its members to adopt new covenants or only to change its existing covenants. In determining the scope of the authority granted to those members, the text of the governing covenants controls. Wilkinson, 180 Wn.2d at 249-51, 256-57.

Next, a reviewing court asks whether the adopted covenant at issue sets forth a change to existing covenants or an entirely new covenant. In making this determination, a reviewing court compares the text of those covenants already in place to the text of the adopted covenant. As described in Wilkinson, if the governing covenants at issue allow a percentage of its members to create *new* covenants, such members can validly create such covenants, "'provided that such power is exercised in a reasonable manner consistent with the general plan of the development.'" 180 Wn.2d at 256 (quoting Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc., 76 Wn. App. 267, 273-74, 883 P.2d 1387 (1994)). If, however, those governing covenants permit a percentage of its members only

to *change* existing covenants, then, pursuant to Wilkinson, a reviewing court must determine whether the adopted covenant in question is a new one or a changed one. An adopted covenant is "new," according to the court, when it is "inconsistent with the general plan of development or [has] no relation to existing covenants." Wilkinson, 180 Wn.2d at 256 (citing Ebel v. Fairwood Park II Homeowners' Ass'n, 136 Wn. App. 787, 793, 150 P.3d 1163 (2007); Meresse v. Stelma, 100 Wn. App. 857, 865-66, 999 P.2d 1267 (2000); Lakeland Prop. Owners Ass'n v. Larson, 121 Ill. App. 3d 805, 459 N.E.2d 1164, 1167, 1169, 77 Ill. Dec. 68 (1984)). An adopted covenant is a "change," according to the court, when it is "consistent with the general plan of development *and* related to an existing covenant." Wilkinson, 180 Wn.2d at 257.[11]

Lastly, a reviewing court asks whether the association in question obtained the requisite percentage of member support in order to adopt such a covenant in light of the authority granted to those members by its governing covenants. Wilkinson, 180 Wn.2d at 255-59. As above, when an association's governing covenants authorize a percentage of its members to create a *new* covenant, such a percentage of its members can validly adopt such a covenant. Wilkinson, 180 Wn.2d at 256 (emphasis added) (citing Ebel, 136 Wn. App. at 793; Meresse, 100 Wn. App. at 865-66; Lakeland, 459 N.E.2d at 1167, 1169). Similarly, when an association's governing covenants only authorize a percentage of its members to *change* existing covenants and the adopted

---

[11] Whether an adopted covenant is "new" or a "change" is discussed in greater detail in Section B.2.i infra.

covenant only constitutes such a change, then such members can validly adopt such a covenant. However, if an association's governing covenants only authorize a percentage of its members to change its existing covenants but the adopted covenant is entirely new, unanimous consent is required. Wilkinson, 180 Wn.2d at 258.

Accordingly, pursuant to Wilkinson, a reviewing court may determine the validity of a covenant adopted by a homeowners' association by asking (1) whether the governing covenants in question grant the association's members the authority to adopt new covenants or only to change its existing covenants, (2) whether the adopted covenant in question constitutes an entirely new covenant or merely a change to existing covenants, and (3) whether the association obtained the percentage of support from its members required to validly adopt such a covenant.

B

The Guetters assert that View Ridge Estates' adoption of the view obstruction covenant at issue was invalid. We disagree.

1

The Guetters first contend that View Ridge Estates' governing covenants authorized its members to change its existing covenants, but not to create new ones. In that regard, the Guetters are correct.

As set forth above, in determining the scope of authority granted to an association's members to adopt covenants, the text of that association's governing covenants controls. Wilkinson, 180 Wn.2d at 249-51, 256-57. As also

13

discussed above, in <u>Wilkinson</u>, the governing covenants of the association therein allowed its members "'to *change* these protective restrictions and covenants in whole or in part,'" thereby only authorizing such members to change the association's existing covenants. 180 Wn.2d at 256-57. Relatedly, in <u>Murphy</u>, Division Three determined that a governing covenants' grant of authority allowing for "amendment" of the association's covenants provided the association's members the authority to change its existing covenants, but not to create new covenants. 26 Wn. App. 2d at 499, 510-11.

In <u>Shaffer</u>, by contrast, we determined that the applicable governing covenants authorized a percentage of its members to create new covenants when those governing covenants authorized its members "'[t]o enforce . . . restrictions, conditions and covenants existing upon *and/or created* for the benefit of parcels of real property in the plat of Sandy Hook Yacht Club Estates, Inc.'" 76 Wn. App. at 270 (first emphasis omitted).

Here, View Ridge Estates' governing covenants provide as follows:

> Section 3. *Amendment*. The covenants and restrictions of this Declaration shall run with and bind the land. . . . *The covenants and restrictions of this Declaration may be amended* during the first twenty (20) year period [from the date this declaration is recorded] by an instrument signed by not less than ninety (90) percent of the Lot Owners, and thereafter by an instrument signed by not less than seventy-five (75) percent of the Lot Owners. *Any proposed amendment* must be consistent with the approved development plan for the P.U.D. and may not contravene the City of Camas P.U.D. Ordinance and must be properly recorded.

(Emphasis added.)

14

View Ridge Estates' governing covenants authorize a percentage of its members to change existing covenants, but not to create new covenants. To amend something is to change it. See BLACK'S LAW DICTIONARY 101 (11th ed. 2019).[12] We thus follow the lead of the court in Murphy and conclude that the authority to adopt an "amendment" to covenants constitutes the authority to change covenants. Therefore, View Ridge Estates' governing covenants granted its members the authority to change its covenants, but not to create new ones.[13]

2

The Guetters next contend that the view obstruction covenant herein is not merely a change to existing covenants but, rather, constitutes an entirely new covenant. We disagree.

i

Whether an adopted covenant is "new" as opposed to a "change" requires further elaboration. Although the court in Wilkinson stated that an adopted covenant is "new" when it is "inconsistent with the general plan of development or

---

[12] Black's Law Dictionary defines "amend" as:
1. To correct or make usu. small changes to (something written or spoken); to rectify or make right <amend the order to fix a clerical error>. 2. To change the wording of; specif., to formally alter (a statute, constitution, motion, etc.) by striking out, inserting, or substituting words <amend the legislative bill>.
BLACK'S, supra, at 101.

[13] View Ridge Estates nevertheless asserts that its declaration's enforcement section provides it with the authority to create new covenants. We disagree. That section reads as follows: "Section 1. Enforcement. The Association, or any Owner, shall have the right to enforce, by any proceeding at law or in equity, all restrictions, conditions, covenants, reservations, easements, liens and charges *now or hereafter imposed by the provisions of this Declaration.*" (Emphasis added.) Given that the enforcement section is immediately followed by the amendment section discussed herein, the plain and obvious meaning of the enforcement provision's use of "hereinafter imposed" is a direct refence to the neighboring amendment section, rather than a self-supporting grant of authority to its members to create new covenants. Wilkinson, 180 Wn.2d at 249-51 (quoting Mains Farm, 121 Wn.2d at 816; Riss, 131 Wn.2d at 623). No other provision within the restated declaration set forth a section pertaining to the creation of new covenants. Thus, View Ridge Estates' assertion fails.

[has] no relation to existing covenants" and also stated that a covenant is a "change" when it is "consistent with the general plan of development *and* related to an existing covenant," the court did not further elaborate on what it meant by "new" or "change." 180 Wn.2d at 256-57. Moreover, the court declined to provide further guidance after recognizing "that no Washington case has described the precise contours of when an amendment would be 'consistent with the general plan of development,'" nor did the court define what it meant by "related to." Wilkinson, 180 Wn.2d at 256.

Nevertheless, the court in Wilkinson clearly distinguished between the adoption of covenants that are "new" and the adoption of covenants that are a "change." That suggests that "new" and "change," as used by the court therein, are not coterminous. Given that, the contours of what is "new" could inform the contours of a "change." In that regard, Wilkinson and Murphy each provide guidance. In Wilkinson, the adopted covenant was new because it nullified existing covenants. 180 Wn.2d at 256-57. In Murphy, the adopted covenant was new because it contained restrictions not grounded in any existing covenants. 26 Wn. App. 2d at 508-11.

With regard to a "change," then, a "change" cannot be something that eliminates an existing covenant or adds a restriction where none existed before—again, that would be something new. Wilkinson, 180 Wn.2d at 256-57; Murphy, 26 Wn. App. 2d at 508-11.

However, a change to existing covenants must result in something different than that which results from those covenants already in place. If that is

so, and a change can neither eliminate existing covenants nor innovate a covenant, then such a difference must instead *modify* those covenants already in place. In that way, such a modification could result in less of something—in which fewer things are restricted or restrictions are lessened—or more of something—in which more things are restricted or existing restrictions are increased. Accordingly, an adopted covenant that constitutes a change to existing covenants could be one that reduces or expands on those covenants already in place.

Such an understanding of "change" comports with Wilkinson's guidance that an association's adoption of a covenant that constitutes a change must be consistent with that association's general plan of development and relate to its existing covenants. Indeed, where a covenant reduces or expands on existing covenants, such a covenant is plainly "related to" those covenants because the change inherently flows from restrictions already within those covenants. Furthermore, where an association adopts such a covenant, the resulting reduction or expansion must nevertheless be "consistent with the general plan of development."[14] In making such a determination, the court in Wilkinson instructed, we must consider "the language of the covenants, their apparent import, and the surrounding facts." 180 Wn.2d at 258.

---

[14] That a change to a covenant must be consistent with the general plan of development is an important consideration concerning the adoption of covenants. Indeed, it is foreseeable that an association, in an attempt to dramatically increase or reduce existing restrictions, might constructively or inadvertently create an entirely new covenant.

17

ii

Here, View Ridge Estates' existing covenants provided, in pertinent part,

as follows:

DECLARATION OF
COVENANTS, CONDITIONS AND RESTRICTIONS
VIEW RIDGE ESTATES HOME OWNERS ASSOCIATION

. . . .

NOW, THEREFORE, . . . all of the Properties . . . shall be held, sold and conveyed subject to the following easements, restrictions, covenants, and conditions, *all of which are for the purpose of enhancing and protecting the value, desirability and attractiveness of the real property*.

. . . .

ARTICLE VI
ARCHITECTURAL CONTROL

Section 1. Architectural Control. No building shall be erected, placed or altered on any lot . . . on the property until the building, plans, specifications, plot plan, landscaping and fencing plan, showing the nature, kind, shape, *height*, materials, and location of such building have been approved in writing as to conformity and harmony of external design with existing structures in the planned unit development, and as to location of the building *with respect to topography and finished ground elevation*, by the Architectural Control Committee . . . .

. . . .

Section 4. Dwelling Quality and Size. The ground floor area of the main structure, exclusive of one-story open porches and garages, shall be not less than 1,250 square feet for a one-story building and not less than 950 square fee[t] for a split level dwelling (main living area). All houses shall have a two-car garage; all townhouses shall have a two-car carport or garage. Any dwelling or structure erected on any lot shall be completed as to external appearance*, including landscaping consistent with the established landscaping design within the properties*, within nine (9) months from the date of commencement of construction. No structure erected elsewhere may be moved upon any lot in this plat.

ARTICLE VII
EXTERIOR MAINTENANCE

In the event an owner of any lot in the properties shall fail to maintain the premises and the improvements situated thereon in a manner satisfactory to the Board of Trustees, the Association, after

18

approval of two-thirds (2/3rds) vote by the Board of Trustees, shall have the right, through its[ ] agents and employees, *to enter upon said parcel and to repair, maintain, and restore* the lot and the exterior of the buildings *and any other improvements thereon.* The cost of such exterior maintenance shall be added to and become a part of the assessment to which such lot is subject.

ARTICLE VIII
USE RESTRICTIONS

Section 1. <u>Enjoyment of Property.</u> The owners shall use their respective properties to their enjoyment in such a manner *so as not to offend or detract from other Owner's enjoyment of their own respective properties.*
. . . .
Section 13. <u>Views.</u> If any outbuilding or fence is not subject to the architectural committees['] approval it shall be designed and constructed in such a fashion *so as not to materially obstruct the view of any other lot owner* and, in no event shall any fence be any greater than six feet in heighth.

(Emphasis added.)

As set forth above, the view obstruction covenant at issue reads as

follows:

No trees or other vegetation, in a view and/or view corridor area, shall be taller than a maximum of fifteen (15) feet or the first story gutter height in the front or back yard of any home, whichever is shorter, where the tree or other vegetation is located, nor shall any trees or other vegetation be taller than a maximum of six (6) feet between any homes if in a view or view corridor. If trees and other vegetation comply with these limits, they are expressly permitted. Taller trees and shrubs are permitted so long as no Member's view is unreasonably obstructed by the taller trees or shrubs.

View Ridge Estates' view obstruction adopted covenant constitutes a

change to its existing covenants, not the creation of a new covenant. Its existing

covenants expressly restricted its members from obstructing one another's views

with six foot tall fences and outbuildings. The adopted covenant in question

modifies those restrictions by, as pertinent here, increasing the height

19

constituting an obstruction to 15 feet and expanding the type of obstructing object to trees and vegetation. Given that, the adopted covenant in question constitutes an increase to an existing view obstruction covenant, not a new covenant, and, in that regard, plainly relates to View Ridge Estates' existing covenants.

The view obstruction adopted covenant is also consistent with View Ridge Estates' general plan of development. Notably, the word "view" appears not only as the seventh word in View Ridge Estates' original declaration, but also as the first word of the name of the association itself. In addition, that the covenants in place already contain a view obstruction covenant in some form further suggests that the view obstruction herein is consistent with the association's general development plan. Additionally, the association's existing covenants also restrict the appearance of the architecture, landscaping, and exterior maintenance of its members' properties, which are restrictions not inconsistent with the restriction on view obstructions herein. Lastly, the view covenant at issue is also consistent with the stated purpose in View Ridge Estates' declaration of "enhancing and protecting the value, desirability and attractiveness of the real property." Indeed, preserving members' views by forbidding an increased range of view obstructions seems quite logically intended to advance the goal of enhancing and protecting its members' properties' values, desirability, and attractiveness. Therefore, the adopted view obstruction covenant herein is also consistent with View Ridge Estates' general plan of development.

Thus, by increasing the restrictions on an existing view obstruction covenant, the adopted view obstruction covenant herein constituted a change to

View Ridge Estates' existing covenants, rather than an entirely new covenant. That change is consistent with View Ridge Estates' general plan of development and logically relates to its existing covenants.

3

The Guetters next assert that View Ridge Estates failed to obtain the requisite support of its members in order to validly adopt the view obstruction covenant in question. We disagree.

As set forth above, View Ridge Estates' declaration indicated that its covenants "may be amended during the first twenty (20) year period [from the date this declaration is recorded] by an instrument signed by not less than ninety (90) percent of the Lot Owners, and *thereafter by an instrument signed by not less than seventy-five (75) percent of the Lot Owners.*" (Emphasis added.) It is undisputed that View Ridge Estates obtained the support of at least 44 of its 46 members in favor of the restated declaration, which contains the view obstruction covenant in question.

View Ridge Estates validly adopted the view obstruction covenant at issue. As applicable here, View Ridge Estates' declaration authorized that 75 percent of its members could change its covenants. As analyzed above, the view obstruction covenant in question constituted a change to its covenants. Therefore, View Ridge Estates did not need unanimous consent from its members to adopt such a covenant but, rather, was only required to obtain the consent of the percentage of members specified in its governing covenants. The parties do not dispute that View Ridge Estates recorded the restated declaration

containing the view obstruction covenant here at issue and that such declaration was signed by not less than 75 percent of its members. Thus, View Ridge Estates obtained the requisite percentage of member support to validly adopt the view obstruction covenant in question.[15]

C

The Guetters next assert that, even if the view obstruction covenant herein was validly adopted, a genuine issue of material fact remains for trial with regard to whether their trees created an unreasonable obstruction as defined in that covenant. Because the Guetters—in several ways—waived or forfeited their right to present such a challenge, their assertion fails.

A party may, through its conduct, waive a right otherwise granted to them in a covenant. Mariners Cove Beach Club, Inc. v. Kairez, 93 Wn. App. 886, 891, 970 P.2d 825 (1999) (concluding that a parties' delay in bringing an action preluded that party from bringing such an action). Furthermore, the party seeking review has the burden of perfecting the record so that the reviewing court has before it all of the relevant evidence, arguments, and rulings. Bulzomi v. Dep't of Lab. & Indus., 72 Wn. App. 522, 525, 864 P.2d 996 (1994) (citing State v. Vazquez, 66 Wn. App. 573, 583, 832 P.2d 883 (1992)). An "insufficient record on appeal precludes review of the alleged errors." Bulzomi, 72 Wn. App.

---

[15] The Guetters also contend that View Ridge Estates' adoption of the view obstruction covenant is invalid because the association did not properly notify them of the meetings where that covenant was discussed nor did it properly obtain their consent to that covenant. However, such allegations are immaterial to our disposition of this matter. As analyzed herein, in order to adopt a change to its covenants, View Ridge Estates must obtain not less than 75 percent of its members' support. It is undisputed that, even without the Guetters' consent, View Ridge Estates obtained significantly more than the percentage of member support required to validly adopt the view obstruction covenant herein. Thus, the Guetters' contention fails.

at 525 (citing Allemeier v. Univ. of Wash., 42 Wn. App. 465, 472-73, 712 P.2d 306 (1985)).

As set forth above, the restated declaration provided that "[t]aller trees and shrubs are permitted so long as no Member's view is unreasonably obstructed by the taller trees or shrubs." The restated declaration also provided the landscape committee with the authority within the context of the homeowners' association to create a record of obstruction disputes, including receiving notice of "a view obstruction occurring by overgrown vegetation," taking "into account all of the affected Members' opinions and perspectives, and the relevant facts and issues surrounding any particular view obstruction issue, including any old and/or new photos of such views if available," and resolving "any view obstruction issue by attempting to formulate an agreed plan of action in writing with the affected Members." In the event that the committee was not able to "resolve the view obstruction issue by agreement between the affected Members," it was then to issue its decision and provide the affected members the opportunity to appeal the matter to View Ridge Estates' board.

Here, the landscape committee was notified by certain View Ridge Estates' members of a potential view obstruction caused by certain trees on the Guetters' property. The committee then contacted the Guetters in an attempt to formulate a plan of action. However, the Guetters refused to cooperate with or participate in that process, did not permit committee members to inspect their property, and indicated that they were refusing to follow the view obstruction covenant as it applied to the trees in question. The committee then issued its

23

decision in writing, provided the Guetters the opportunity to appeal, and the board issued its decision.  Thereafter, in a letter sent to the board, the Guetters reiterated their refusal to comply with the view obstruction covenant.  Now, on appeal, the Guetters assert that, even if that view obstruction covenant was validly adopted, they should nevertheless prevail because the record does not support that the complaining members' views were unreasonably obstructed by the trees in question.

The Guetters have twice forfeited their right to submit such a challenge.  The restated declaration provided procedures within the context of the homeowners' association to mediate, create a record, and reach a decision concerning disputes pertaining to the reasonableness of a view obstruction.  The Guetters refused to comply with those procedures.  Furthermore, no record of such a process was submitted to the superior court for its consideration.  Consequently, View Ridge Estates was denied the opportunity to respond to such a submission and the superior court did not have the opportunity to issue a ruling in response thereto.  Accordingly, we have neither a record of a proceeding within the homeowners' association nor a record of trial court argument, analysis, and rulings predicated on such a record concerning the reasonableness of the obstruction in question.  Thus, the Guetters have waived their right to submit such a challenge on appeal, and we decline to address their assertion.[16]

_____

[16] The Guetters also contend that the trial court erred in its summary judgment orders because, according to the Guetters, the view obstruction covenant is ambiguous, vague, and subjective.  However, the Guetters provide no pertinent decisional authority in support of that contention.  We need not consider arguments that are unsupported by authority.  Cowiche

Accordingly, the trial court did not err by granting View Ridge Estates' motion for summary judgment and by denying the Guetters' motion for partial summary judgment.

III

The Guetters next assert that the trial court erred by ordering injunctive relief in the context of summary judgment in this matter. The trial court erred, the Guetters contend, because injunctive relief was inappropriate in this matter and, in fashioning such relief, the court did not properly balance the equities between the parties. Again, we disagree.

Our Supreme Court recently described the standard of review applicable to the appropriateness of an equitable remedy at summary judgment and to the trial court's subsequent fashioning of that remedy.

> As a general rule, we review summary judgment orders de novo and engage in the same analysis as the trial court. Keck [v. Collins], 184 Wn.2d [358, ]370[, 357 P.3d 1080 (2015)]; Crisostomo Vargas v. Inland Wash., LLC, 194 Wn.2d 720, 728, 452 P.3d 1205 (2019). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). . . .
> In contrast, we review the *fashioning* of equitable remedies for an abuse of discretion because trial courts have "broad discretionary power to fashion equitable remedies." In re Foreclosure of Liens, 123 Wn.2d 197, 204, 867 P.2d 605 (1994). Thus, the standard of review depends on the question presented, because "[w]hile the fashioning of the remedy may be reviewed for abuse of discretion, the question of whether equitable relief is appropriate is a question of law." Niemann v. Vaughn Cmty. Church, 154 Wn.2d 365, 374, 113 P.3d 463 (2005).

Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 819, 828 P.2d 549 (1992). The Guetters' contention thus fails.

25

Borton & Sons, Inc. v. Burbank Props., LLC, 196 Wn.2d 199, 205-06, 471 P.3d 871 (2020) (some alterations in original).

A

The Guetters assert that the trial court erred by granting injunctive relief as part of granting summary judgment in this matter. The court erred in so doing, the Guetters contend, because View Ridge Estates did not establish its entitlement to injunctive relief as a matter of law.

When an "injunction is being reviewed as an appeal from an order granting it in summary judgment and its validity involves only questions of law, our review is de novo." Hoggatt v. Flores, 152 Wn. App. 862, 868, 218 P.3d 244 (2009) (citing Mains Farm, 121 Wn.2d at 813). "Appellate courts 'may affirm the trial court on any theory established in the pleadings and supported by proof, even where the trial court did not rely on the theory.'" Meyers v. Ferndale Sch. Dist., 12 Wn. App. 2d 254, 263-64, 457 P.3d 483 (2020) (internal quotation marks omitted) (quoting Potter v. Wash. State Patrol, 165 Wn.2d 67, 78, 196 P.3d 691 (2008)), aff'd, 197 Wn.2d 281, 481 P.3d 1084 (2021).

In the context of the appropriateness of injunctive relief and violations of restrictive covenants, we have recognized that

> [e]nforcement of residential restrictive covenants is favored in Washington. Riss, 131 Wn.2d at 622-24; Metzner v. Wojdyla, 125 Wn.2d 445, 450, 886 P.2d 154 (1994). Generally, servitudes may be enforced by any appropriate remedy or combination of remedies. Injunctive relief is one of these remedies.

Bauman v. Turpen, 139 Wn. App. 78, 92, 160 P.3d 1050 (2007) (footnotes omitted) (citing RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 8.3 (2000);

26

Hollis, 137 Wn.2d at 699; Foster v. Nehls, 15 Wn. App. 749, 752-53, 551 P.2d

768 (1976)). In addition,

> "[o]ne who seeks relief by permanent injunction must show:
> (1) that he has a clear legal or equitable right, (2) that he has a
> well-grounded fear of immediate invasion of that right, and (3) that
> the acts complained of are either resulting in, or will result in, actual
> and sustained injury to him." Tyler v. Van Aelst, 9 Wn. App. 441,
> 443, 512 P.2d 760 (1973) (citing Port of Seattle v. Int'l
> Longshoremen's & Warehousemen's Union, 52 Wn.2d 317, 319,
> 324 P.2d 1099 (1958)).

Markoff v. Puget Sound Energy, Inc., 9 Wn. App. 2d 833, 850-51, 447 P.3d 577

(2019).

Here, the parties do not contest that View Ridge Estates' declaration

granted it the authority to institute legal action against its members allegedly in

breach of its restrictive covenants. View Ridge Estates' restated declaration

contains a view obstruction covenant that, as analyzed above, was validly

adopted. View Ridge Estates, in its complaint, argued that the injury in

question—the view obstructions caused by the Guetters' trees—cannot be

compensated by money damages, that such damages arising from an obstructed

view cannot be ascertained with any degree of certainty, and that a remedy at

law would not be efficient because the height of the Guetters' trees are—and will

continue to be—in breach of those covenants unless a court issues an injunction.

Injunctive relief was appropriate here. View Ridge Estates has a clear

legal right to have its members comply with its validly adopted covenants—

including the view obstruction covenant herein. View Ridge Estates also has a

well-grounded fear that the trees in question—due to their height at the time of

the submission of its complaint—are invading that legal right because the trees are already in violation of its covenants. Lastly, the Guetters' refusal to remove the obstruction caused by those trees is resulting and will continue to result in actual and sustained injury to View Ridge Estates because certain of its members had and continue to have their view obstructed by those trees. Thus, injunctive relief was an appropriate remedy at summary judgment.[17]

B

The Guetters next contend that the trial court abused its discretion by ordering the Guetters to trim, top, or remove the trees in question. We disagree.

The fashioning of an injunction at summary judgment "is addressed to the sound discretion of the trial court to be exercised according to the circumstances of the particular case." See Holmes Harbor Water Co. v. Page, 8 Wn. App. 600, 603, 508 P.2d 628 (1973) (citing Grande Ronde Lumber Co. v. Buchanan, 41 Wn.2d 206, 212-15, 248 P.2d 394 (1952); Isthmian S.S. Co. v. Nat'l Marine Eng'rs' Beneficial Ass'n, 41 Wn.2d 106, 117, 247 P.2d 549 (1952)); see also Borton & Sons, 196 Wn.2d at 205-06.

"A trial court abuses its discretion when its decision or order is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons." Green, 137 Wn. App. at 698 (citing Brand v. Dep't of Lab. & Indus., 139 Wn.2d 659, 665, 989 P.2d 1111 (1999)).

_____

[17] The Guetters contend that View Ridge Estates sought to establish a *per se* standard for injunctive relief as the default remedy in the event of a breach of a covenant. Because we find that injunctive relief was appropriate here, we decline to consider that contention.

"A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard."

In re Dependency of Z.A., No. 84122-0-I, slip. op. at 25 (Wash. Ct. App. Dec. 26, 2023) https://www.courts.wa.gov/opinions/pdf/841220%20orderandopin.pdf (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

Furthermore,

"[w]here a judgment or order is correct it will not be reversed merely because the trial court gave wrong or insufficient reason [for its rendition.]" Pannell v. Thompson, 91 Wn.2d 591, 603, 589 P.2d 1235 (1979). When the facts and law indicate an appropriate reason for the trial court's decision we must affirm the trial court on the basis of the applicable law.

Keogan v. Holy Fam. Hosp., 95 Wn.2d 306, 317, 622 P.2d 1246 (1980) (first alteration in original). Indeed, "[i]n reviewing for abuse of discretion, 'we may affirm the trial court on any basis that the record supports.'" Roemmich v. 3M Co., 21 Wn. App. 2d 939, 957, 509 P.3d 306 (quoting State v. Arndt, 194 Wn.2d 784, 799, 453 P.3d 696 (2019)), review denied, 200 Wn.2d 1015. In so doing, we may consider "any theories 'established by the pleadings and supported by the proof,' even if these theories were not originally considered by the trial court." Arndt, 194 Wn.2d at 799 (quoting LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989)).

Here, the trial court's injunction order read, in pertinent part, as follows:

Based on the Order on Plaintiff's Motion for Summary Judgment signed by Clark County Superior Court Judge Suzan L. Clark on September 2, 2021, the Order Denying Defendants' Motion for

29

Partial Summary Judgment, and the voluntary dismissal of
Intervenors' claim for money damages;
NOW, THEREFORE, IT IS HEREBY ORDERED AND
ADJUDGED, that the Plaintiff and Intervenors shall have a
judgment against Defendants as follows:
1. Defendants are ordered to trim, top, or[ ] remove trees on
their lot in the manner set forth in the decision of Plaintiff's
Landscape Committee, dated June 10, 2019. Defendants shall
fully comply with this order not later than January 15, 2023.

The trial court did not abuse its discretion. The relief ordered by the court

was within the range of acceptable choices. The breach in question involved a

view obstruction caused by certain trees. In weighing the equities, the court was

provided with a wide range of equitable relief. Here, the court fashioned a

remedy calculated to cure the breach while balancing the impact of that remedy

by allowing the Guetters to select the method by which the violation was to be

cured (trimming, topping, or removing). Furthermore, the factual findings

underlying the relief ordered are supported by the record. The record plainly

contains ample evidence to support that the views of at least two members of

View Ridge Estates were—and presumably continue to be—obstructed by nine

trees on the Guetters' property and that such obstruction constituted a breach of

the covenant at issue. Lastly, the relief ordered by the court properly applies the

facts to the correct standard. As analyzed above, injunctive relief is appropriate

herein and it is undisputed that trimming, topping, or removing the trees in

question should cure the violation arising from the Guetters' breach of the view

obstruction covenant.

Therefore, while reasonable minds could differ as to the precise relief to

be fashioned by the trial court, nothing in the record indicates that the court's

decision was outside the range of acceptable choices, based on unsupported facts, or a misapplication of the facts to the applicable rules. Thus, the trial court did not abuse its discretion.

C

The Guetters nevertheless rely on four cases—Bauman v. Turpen, 139 Wn. App. 78; Wimberly v. Caravello, 136 Wn. App. 327; Piepkorn v. Adams, 102 Wn. App. 673, 10 P.3d 428 (2000); and Foster v. Nehls, 15 Wn. App. 749—for the proposition that the trial court erred by not considering a seven factor test for injunctive relief because, according to the Guetters, the trial court must consider each of those factors prior to issuing an injunction. We disagree.

As an initial matter, none of the cases relied upon by the Guetters for that proposition expressly state that a trial court's performance of such a multi-factor analysis is mandatory. See Bauman, 139 Wn. App. at 92-93; Wimberly, 136 Wn. App. at 340; Piepkorn, 102 Wn. App. at 684; Foster, 15 Wn. App. at 753-54.[18] Indeed, even one of the cases relied upon by the Guetters stated—and emphasized—that

> the [trial] court *may* consider a number of factors. These include the availability of other adequate remedies, misconduct by the plaintiff, and the relative hardship if injunctive relief is granted or denied. Hollis v. Garwall, Inc., 88 Wn. App. 10, 16, 945 P.2d 717 (1997), aff'd, 137 Wn.2d 683, 974 P.2d 836 (1999). These factors

---

[18] The closest approximation to the proposition urged by the Guetters is stated in Piepkorn, that "a court must balance the equities before it grants an injunction against an 'innocent defendant who proceeds without knowledge or warning that his [or her] activity encroaches upon another's property rights.'" 102 Wn. App. at 684 (alteration in original) (quoting to Hollis, 137 Wn.2d at 700)). However, it is axiomatic that a trial court granting equitable relief (such as an injunction) must balance the equities between the parties. It does not follow that, in so doing, a court must conduct a specific multi-factor analysis. Thus, the Guetters' assertion fails.

31

are not, however, essential elements for the grant of injunctive relief. Hollis, 88 Wn. App. at 16.

Wimberly, 136 Wn. App. at 340.[19]

Furthermore, the decisional authority relied on in those cases was either our decision in Holmes Harbor Water Co. v. Page, 8 Wn. App. 600, or our Supreme Court's decision in Hollis v. Garwall, Inc., 137 Wn.2d 683, and neither holds that a trial court must conduct such a multi-factored analysis. 137 Wn.2d at 699-70; 8 Wn. App. at 603. Indeed, in Holmes, we relied on our Supreme Court's decision in Steele v. Queen City Broad. Co., 54 Wn.2d 402, 341 P.2d 499 (1959), for the proposition that "[a] trial court upon considering whether to grant or deny an injunction *may* recognize circumstances and weigh [such] equitable factors." Holmes, 8 Wn. App. at 603 (emphasis added) (citing Steele, 54 Wn.2d at 411; RESTATEMENT (FIRST) OF TORTS § 936 (1939)). In Steele, the court provided a nonexclusive list of factors to consider and instructed that, "[w]hether or not an injunction will issue must be determined by balancing the equities of the parties. No one factor is controlling." 54 Wn.2d at 411 (quoting RESTATEMENT (FIRST) OF TORTS § 936(1)).

---

[19] Similarly, in an unpublished decision's discussion of those many factors involved in determining employment relationship, we stated the following:

> While courts have generally used the term "factors" to describe the considerations a court should ponder when evaluating the circumstances of the relationship between a putative employer and an employee, these "factors" are not akin to elements. The economic reality test "offers a way to think about the subject and not an algorithm. That's why toting up a score is not enough."

Espinoza v. MH Janitorial Servs. LLC, No. 76752-6-I, slip op. at 10 (Wash. Ct. App. Nov. 4, 2019) (unpublished), http://www.courts.wa.gov/opinions/pdf/767526.pdf (quoting Reyes v. Remington Hybrid Seed Co., 495 F.3d 403, 408 (7th Cir. 2007)). We recognized that those employment relationship considerations were "'things to think about,' which more clearly denotes their function within the 'economic reality' test, rather than as 'factors.'" Espinoza, No. 76752-6, slip op. at 10-11. Similarly, here, we consider those factors relating to the fashioning of equitable relief as "things to think about" when balancing the equities between the parties.

Similarly, in Hollis, the court interpreted Holmes and concluded that the factors described therein were permissive in nature, rather than mandatory. 137 Wn.2d at 699 ("Holmes holds that a court considering whether to grant an injunction *may* consider and weigh equitable factors, such as the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied" (citing Holmes, 8 Wn. App. at 603)).

Therefore, a trial court is not required to conduct a multi-factor analysis in its consideration of granting injunctive relief. The trial court herein did not err by not engaging in such a rote analysis in this matter. Instead, the trial court reasonably exercised its discretion. It committed no error. Accordingly, the trial court did not err in its grant of injunctive relief.

IV

The Guetters assert that the trial court abused its discretion in granting an award of attorney fees and costs to View Ridge Estates and to Haertl and Kolisch. We agree.

> An appellate court will uphold an attorney fee award unless it finds the trial court manifestly abused its discretion. Discretion is abused when the trial court exercises it on untenable grounds or for untenable reasons. Chuong Van Pham v. City of Seattle, 159 Wn.2d 527, 538, 151 P.3d 976 (2007). The burden of demonstrating that a fee is reasonable is upon the fee applicant. Scott Fetzer Co. v. Weeks, 122 Wn.2d 141, 151, 859 P.2d 1210 (1993).

Berryman v. Metcalf, 177 Wn. App. 644, 656-57, 312 P.3d 745 (2013). In considering such an award, however, "'[c]ourts must take an *active* role in assessing the reasonableness of fee awards, rather than treating cost decisions

as a litigation afterthought.  Courts should not simply accept unquestioningly fee affidavits from counsel.'" Berryman, 177 Wn. App. at 657 (quoting Mahler v. Szucs, 135 Wn.2d 398, 434-35, 957 P.2d 632, 966 P.2d 305 (1998)). Furthermore,

> [a] trial court does not need to deduct hours here and there just to prove to the appellate court that it has taken an active role in assessing the reasonableness of a fee request.  But to facilitate review, the findings must do more than give lip service to the word "reasonable."  *The findings must show how the court resolved disputed issues of fact and the conclusions must explain the court's analysis.*

Berryman, 177 Wn. App. at 658 (emphasis added); accord Mayer v. City of Seattle, 102 Wn. App. 66, 82-83, 10 P.3d 408 (2000) ("Because the trial court made no findings regarding the specific challenged items, the record does not allow for a proper review of these issues.").

Here, View Ridge Estates requested a total award of $46,690.49, including attorney fees and costs.  Haertl and Kolisch requested a total award of $41,865.00.  Opposing View Ridge Estates' requests, the Guetters argued that certain costs were unsupported and unexplained by its invoices, that certain paralegal compensation was not properly documented, and that certain attorney compensation was vague or pertained to unsuccessful or unexplained activities. The Guetters also opposed Haertl's and Kolisch's request for such an award, arguing that the requested costs pertained to other litigation that was stayed and that the attorney fee award was unnecessary, unsuccessful, and entirely duplicative of View Ridge Estates' efforts.

The trial court granted an award of attorney fees and costs to View Ridge Estates and to Haertl and Kolisch, subtracting $6,800 and $8,000 from their requests, respectively. The trial court did not explain its analysis in so reducing the awards. The trial court also did not address any of the Guetters' numerous objections raised in response to those requests.

The trial court erred. A trial court "must show how the court resolved disputed issues of fact and the conclusions must explain the court's analysis." Berryman, 177 Wn. App. at 658. The trial court did not do so here, and the record does not allow for a proper review of these issues. Mayer, 102 Wn. App. at 82-83. Thus, the trial court abused its discretion.

We have stated that, in such a situation,

> a fee award that is unsupported by an adequate record will be remanded for the entry of proper findings of fact and conclusions of law that explain the basis for the award. See Mahler, 135 Wn.2d at 435; Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 715-16, 9 P.3d 898 (2000) (remanded because trial court "simply announced a number"). This is because the trial judge is "in the best position to determine which hours should be included in the lodestar calculation." Chuong Van Pham, 159 Wn.2d at 540.

Berryman, 177 Wn. App. at 659; accord Mayer, 102 Wn. App. at 83 ("On remand, therefore, the trial court is directed to enter thorough findings regarding these specific challenged time entries.").

However, "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 563 U.S. 826, 838, 131 S. Ct. 2205, 180 L. Ed. 2d 45 (2011). Indeed, "the determination of fees 'should not result in a second major litigation.'" Fox, 563 U.S. at 838 (quoting

Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)). We encourage the trial court and the parties to keep as much in mind on remand.

V

Both the Guetters and View Ridge Estates request an award of attorney fees based on the association's declaration or restated declaration described herein and RAP 18.1.

A party may request reasonable attorney fees on appeal if an applicable law grants the party the right to recover. RAP 18.1. We generally recognize a provision in a contract allowing an award of attorney fees to include an award of fees on appeal as well as at trial. Falcon Props., LLC v. Bowfits 1308, LLC, 16 Wn. App. 2d 1, 14, 478 P.3d 134 (2020) (citing Edmundson v. Bank of Am., N.A., 194 Wn. App. 920, 932-33, 378 P.3d 272 (2016)).

View Ridge Estates has substantially prevailed on appeal. Thus, we grant its request for an award of attorney fees pursuant to RAP 18.1, and we deny the Guetters' request for such an award.[20] Upon proper application, a commissioner of this court will enter an appropriate award.

---

[20] Respondents Haertl and Kolisch do not specifically request an award of attorney fees on appeal. Rather, their briefing only concurs with certain sections of respondent View Ridge Estates' appellate brief. Therefore, we grant them no award of appellate attorney fees.

Affirmed in part, reversed in part, and remanded.

Duyn, J.

WE CONCUR:

Coburn, J.        Mann, J.